UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael F. Wasserman

      vs.                            Civil Action No. 06-1005 (RWR)

Denise Rodacker, *et al.*

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' [17] MOTION TO DISMISS**

    Defendant Denise Rodacker arrested, battered and imprisoned plaintiff for thirty hours because he declined to her request that he submit to questioning by her. Although she showed no concern at the time for the fact that plaintiff's dogs were not on leash, she now attempts to justify the arrest and imprisonment on that basis. She also claims that the United States is liable for her common-law delicts under the Federal Tort Claims Act and that plaintiff must therefore proceed against it and not her. Her defenses must fail.

    First, plaintiff's common-law claims should proceed against defendant Rodacker individually because were they to proceed against the United States, plaintiff would be entitled to a trial by jury under the Seventh Amendment. The FTCA, however, provides that any trial be by the court. That provision is not severable from the remainder of the Act. Therefore, plaintiff's common-law claims should proceed against defendant Rodacker alone.

    Second, defendant Rodacker's assertion of qualified immunity must fail because there are disputed issues of material fact concerning the arrest and because the dog leash regulation on which she relies is void.

### I. FACTUAL BACKGROUND

    Plaintiff was walking his dogs in Montrose Park on Sunday morning, February 20, 2005. Plaintiff's Statement of Material Facts as to Which There Exists a Genuine Issue ("PSOM") ¶ 1. While on routine patrol, defendant Rodacker, a private in the United States Park Police, saw

plaintiff with his dogs off leash and followed him. Defendants' Statement of Material Facts Not in Genuine Dispute ¶¶ 1, 2. She called out, asking plaintiff whether he would answer some questions. PSOM ¶ 2. Defendant Rodacker did not say what the questions would concern. *Id*. Plaintiff replied that he did not want to and did not have to answer defendant Rodacker's questions and continued walking. PSOM ¶ 3. Defendant Rodacker asserted that plaintiff did have to answer her questions, but did not say why or what those questions would be about. PSOM ¶ 4.

Defendant Rodacker caught up to plaintiff and placed her hand on his left shoulder. PSOM ¶¶ 4-5. Plaintiff immediately stopped and stood still. PSOM ¶ 6. Defendant Rodacker twisted plaintiff's left arm behind his back and forced it upward. PSOM ¶ 14. Plaintiff nevertheless offered no resistance to defendant Rodacker, nor did any person or animal do so at any time. PSOM ¶ 8.

Plaintiff asked defendant Rodacker why he was under arrest. PSOM ¶ 7. Defendant Rodacker replied that he was under arrest for resisting arrest. *Id*. Defendant Rodacker did not say that she was arresting plaintiff for walking his dogs off leash. PSOM ¶¶ 7, 9, 10. Defendant Rodacker asked plaintiff only two questions after the arrest and before arriving at the station: (1) whether plaintiff had any weapons and (2) whether he wanted his friends to take custody of his dogs. PSOM ¶ 11.

Defendant Rodacker took plaintiff to the Rock Creek Station for booking, leaving the handcuffs on plaintiff while he was being transported in the squad car. PSOM ¶ 14. After booking, defendant Rodacker told plaintiff she was charging him with Assault on a Police Officer because by refusing to stop to answer her questions, he had "obstructed" and "impeded" her. Wasserman Affidavit, Motion Ex. 10, ¶ 7. Defendant Rodacker said that because Assault on a Police Officer was a felony, he would have to go to the Central Cell Block to await initial

presentment the following day. PSOM ¶ 15. But for the felony charge, plaintiff would have been released from the station. *Id.*

After booking plaintiff, defendant Rodacker took plaintiff to the Central Cell Block at 300 Indiana Avenue, again handcuffing him behind his back. PSOM ¶ 14. Plaintiff was imprisoned at the Central Cell Block from 11:30 a.m. until the next morning, Monday, February 21, 2005. Wasserman Declaration, Opp. Ex. A, ¶ 11. Plaintiff was then transferred to the holding area in 500 Indiana Avenue, pending initial presentment in the Superior Court of the District of Columbia. *Id.* Upon presentment, the Office of the United States Attorney announced that it would not file charges against plaintiff. PSOM ¶ 17. The Office of the Attorney General of the District of Columbia announced that it was charging plaintiff with "dog at large." PSOM ¶ 18. Plaintiff was then released on personal recognizance, at 3:00 p.m. PSOM ¶ 16.

## II.  COMMON LAW CLAIMS NOT BARRED BY FEDERAL TORT CLAIMS ACT

The Federal Tort Claims Act does not apply. It unconstitutionally deprives plaintiff of his Seventh Amendment right to a jury trial. The appropriate remedy is to hold that where a claimant has not waived the right to jury trial, the exclusivity and substitution provisions of the FTCA do not apply.

### A.  Jury Trial Is Required for Claims Under Waiver of Sovereign Immunity

The first clause of the Seventh Amendment provides that in "suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." It has long been settled that "the phrase 'Suits at common law' refers to 'suits in which legal rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered.'" *Chauffeurs, Teamsters & Helpers*

*v. Terry*, 494 U.S. 558 (1990) (quoting *Parsons v. Bedford*, 3 Pet. 433, 447 (1830)). The right

extends to causes of action created by Congress. *Tull v. United States*, 481 U.S. 412, 417 (1987).

Significantly, the Seventh Amendment contains no qualification excluding suits at common

law involving the sovereign. That is not for want of language suitable. As first proposed by

Madison, the jury trial guarantee would have been expressed in these words: "In suits at common

law, *between man and man*, the trial by jury, as one of the best securities to the rights of the

people, ought to remain inviolate." Speech of James Madison in the House of Representatives

(June 8, 1789), *quoted in* THE COMPLETE BILL OF RIGHTS 493-94 (Neil H. Cogan, ed., 1997).

The first time the Supreme Court addressed the question of the right to a jury trial in claims

against the government was in dicta in *McElrath v. United States*, 102 U.S. (12 Otto) 426 (1880).

In that case, a government contractor had filed a claimed in the Court of Claims. As permitted by

the statute, the government asserted a counterclaim. The contractor demanded a trial by jury on

the government's counterclaim. On review, the Supreme Court held that by bringing his claim

against the government in the Court of Claims, the contractor had waived his right to a trial by

jury. The Court stated, without citation to any authority:

> Suits against the government in the Court of Claims, whether reference be had to the
> claimant's demand, or to the defence, or to any set-off, or counter-claim which the
> government may assert, are not controlled by the Seventh Amendment. They are not suits
> at common law within its true meaning. The government cannot be sued, except with its
> own consent. It can declare in what court it may be sued, and prescribe the forms of
> pleading and the rules of practice to be observed in such suits. It may restrict the
> jurisdiction of the court to a consideration of only certain classes of claims against the
> United States. Congress, by the act in question, informs the claimant that if he avails
> himself of the privilege of suing the government in the special court organized for that
> purpose, he may be met with a set-off, counter-claim, or other demand of the government,
> upon which judgment may go against him, without the intervention of a jury, if the court,
> upon the whole case, is of opinion that the government is entitled to such judgment. If the
> claimant avails himself of the privilege thus granted, he must do so subject to the
> conditions annexed by the government to the exercise of the privilege. Nothing more need
> be said on this subject.

Because the contractor was not seeking a jury trial on his own claim, the Court's assertion that the Seventh Amendment does not apply to such cases is, strictly speaking, dicta. Since *McElrath*, the Court has no gone no further in its explanation. Indeed, though it has in several cases reiterated its dicta in further dicta, it has never been asked to rule on whether the Seventh Amendment applies when the United States waives its immunity to suit.

*McElrath* should be confined to its facts. One who enters into a voluntary relationship with the government may fairly be said to accept on the government's terms such remedies as are made available to him. In the present case, however, plaintiff never entered into any voluntary relationship with the government. In fact, plaintiff never asserted any kind of claim against the government—neither administrative nor judicial. Plaintiff sued an individual in tort. The United States is a volunteer in this suit; it has intervened in order to indemnify its servant. In no way can plaintiff be said to have waived his right to a jury trial on his claim.

It is also clear beyond doubt that in England in 1791—and long before—when the crown consented to be sued, the proceeding was at "common law," as opposed to "equity," and that any issue of fact arising in such a case was tried by jury. STAMFORD, PREROGATIVE 77a (1567); *id*. 77b (1607); FINCH, NOMOTECHNIA 77 (1613) (App. I, at 21); COKE, FOURTH INSTITUTE 80 (1648) (App. I, at 39); 2 WOOD, INSTITUTE 788 (1720) (App. I, at 43); WOOD, INSTITUTE 460 (1724) (App. I, at 44); WOOD, INSTITUTE 480 (1768) (App. I, at 46); WOOD, INSTITUTE 459 (1772) (App. I, at 46); ABRIDGMENT OF CASES IN EQUITY 128 (4th ed. 1755) (App. I, at 48); BULLER, NISI PRIUS 216 (1791) (App. I, at 50); 3 BLACKSTONE, COMMENTARIES *48 (App. I, at 53); *id*. *260 (App. I, at 57-58); SULLIVAN, FEUDAL LAW 332, 334 (1772) (App. I, at 60-61). Therefore, the Seventh Amendment gives plaintiff a right to a jury trial.

### B. Jury Trial Provision Inseverable from Liability and Exclusivity Provisions

The question is one of choosing the proper remedy for the statute's denial of a constitutionally-required trial by jury. *See United States v. Booker*, 543 U.S. 220, 245 (2005).[1] Plaintiff proposes that where the claimant has not waived his right to a jury trial, either by contracting with the government or by filing a claim against it—as plaintiff has not in this case— the appropriate remedy is that the FTCA's substitution and exclusivity clauses not apply to a claim against the officer, essentially returning the situation to that which existed at the time of the Supreme Court's unanimous decision in *Westfall v. Erwin*, 484 U.S. 292 (1987). The remedy is appropriate because Congress has provided for jury trials in cases brought against it only where the quantum of damages was limited, *i.e.*, in tax refund, War Risk Insurance, and Title VII claims —the last, of course, being subject to a $300,000 limit on non-pecuniary damages.

Both the original Federal Tort Claims Act, as enacted in 1946, and the 1948 statute enacting title 28 into law contained standard severability clauses. Those clauses do not control, however. In *Williams v. Standard Oil Co.*, 278 U.S. 235, 242 (1929), the Court explained:

> The effect of the statutory declaration [of separability] is to create in the place of the presumption [of inseparability] the opposite one of separability; that is to say, we begin, in the light of the declaration, with the presumption that the Legislature intended the act to be divisible, and this presumption must be overcome by considerations which make evident the inseparability of its provisions or the clear probability that the invalid part being eliminated the Legislature would not have been satisfied with what remains.

In other words, *id.* at 241 (quoting *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924)):

> The question is one of interpretation and of legislative intent, and the legislative declaration "provides a rule of construction which may sometimes aid in determining that intent. But it is an aid merely; not an inexorable command."

---

1 "We here turn to the second question presented, a question that concerns the remedy." Id. at 245. "We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory <u>incompatible</u> with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, which depends upon the Guidelines' mandatory nature." Id. at 245 (citations omitted).

"Where the act is such that the legislature would not have passed it without the invalid parts, the whole act must be held inoperative." 2 NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 44:3, at 555 (2001). "In determining legislative intent the circumstances under which the particular act was passed will be considered. Such factors as the history of the act, ... may be given weight." *Id*. at 557-58 (footnote omitted) (citing *Great Northern R. Co. v. United States*, 315 U.S. 262 (1942)). "The ultimate determination of severability will rarely turn on the absence or presence of a severability clause but whether Congress would have enacted the remainder of the statute absent the invalid portion." *Id*. § 44:4, at 566 n.6 (citing *EEOC v. Hernando Bank*, 724 F.2d 1188 (5th Cir. 1984) (quoting *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968)). "In ruling that the legislature would not have enacted separately the valid part of a statute, courts describe the valid and invalid parts of the act as having been conditions, considerations, or compensations for each other. To render the entire act void, the invalid part of the act need not be the sole inducing cause for passage of the act, but it must be an inducing cause in some important aspect." *Id*. § 44:6, at 580 (footnotes omitted).

In deciding the question of severability with respect to a jury-trial requirement, it is particularly important to consider the overarching effect that such a requirement has on proceedings. *See Booker*, 543 U.S. at 248:

> But the constitutional jury trial requirement would nonetheless affect every case. It would affect decisions about whether to go to trial. It would affect the content of plea negotiations. It would alter the judge's role in sentencing. Thus we must determine likely intent not by counting proceedings, but by evaluating the consequences of the Court's constitutional requirement in light of the Act's language, its history, and its basic purposes.

It should be particularly noted that making the remedy against the United States exclusive only where the claimant has waived his right to a jury trial would not prevent the government from either representing or indemnifying employees such as defendant Rodacker. *See* 43 C.F.R.

7

22.6 (2005), 55 Fed. Reg. 4610 (Feb. 9, 1990) (providing for indemnification of Department of Interior employees).

### III.   CONSTITUTIONAL CLAIMS NOT BARRED BY QUALIFIED IMMUNITY

Defendant Rodacker's claim of qualified immunity should be denied. Under clearly-established law, there was no probable cause to arrest plaintiff for Assault on a Police Officer nor for Dog Off Leash. There is a dispute of material fact concerning whether plaintiff resisted defendant Rodacker, precluding summary judgment on the issue excessive force.

### A.   No Probable Cause for Arrest and Prosecution

Under governing law, defendant Rodacker had the power to make warrantless arrests only on probable cause to believe an offense was being committed. In this case, defendant Rodacker justifies based on two alleged offenses: Assault on a Police Officer and Dog Off Leash. As shown below, the evidence viewed in the light most favorable to plaintiff establish that there was no probable cause to believe that plaintiff was committing or had committed Assault on a Police Officer, as the offense had been construed by the District of Columbia Court of Appeals at the time of the arrest. Furthermore, as shown below, the District of Columbia regulation relied on by defendant to justify arrest for Dog Off Leash is void, because the Commissioners purported to adopt it before they had authority to do so. Because there was no such offense as Dog Off Leash, defendant Rodacker had no statutory or common-law power to effect a warrantless arrest.

**Statutory power to arrest.** In the District of Columbia, the United States Park Police have the same powers and duties as the Metropolitan Police.[1] Act of Aug. 5, 1882, ch. 389, § 3, para.

---

1   The Park Police have slightly different arrest powers in the "environs" of the District. *See* D.C. Code § 5-206 (2001). The "environs of the District of Columbia" are defined for that purpose to embrace several specified cities and counties in Virginia and Maryland, but *not* the District itself. *Id.* § 5-208. In addition, the Secretary of the Interior has the power to designate "certain officers or employees" who shall have power to "make arrests without warrant for any offense against the United States committed in his presence, or for any felony cognizable under the laws of the United States if he has reasonable grounds to believe that the person to be arrested has committed or is committing such felony, provided such arrests occur within" the National Park System. 16 U.S.C.

7,[1] *codified to* D.C. Code § 5-201 (2001). The Metropolitan Police have all the "all the common law and statutory powers of constables, except for the service of civil process and for the collection of strictly private debts, in which designation fines imposed for the breach of the ordinances in force in the District shall not be included." R.S.D.C. § 394 (1874), *partially codified to* D.C. Code § 5-127.04(a) (2001).[2] In addition, D.C. Code § 23-581(a) provides generally:

> (1) A law enforcement officer[3] may arrest, without a warrant having previously been issued therefor—
>
> (A) a person who he has probable cause to believe has committed or is committing a felony;
>
> (B) a person who he has probable cause to believe has committed or is committing an offense in his presence; ....

### 1.  No Probable Cause to Arrest for Assault on Police Officer

The District of Columbia Court of Appeals held in 1999 that the APO statute is not violated when, before an arrest, a person ignores a command to stop, uses abusive language, and walks away from the officer.[4] *In re C.L.D.*, 739 A.2d 353, 357 (D.C. 1999) (*per curiam*). This is consistent with holdings in other jurisdictions that verbal expressions of annoyance with an investigation are not criminal. *Brumfield v. Jones*, 849 F.2d 152, 155 (5th Cir. 1988) ("Under

---

§ 1a–6(b)(1).

1  The 1882 Act provided, "That hereafter all watchmen [called United States Park Police since 1919] provided for by the United States Government for service in any of the public squares and reservations in the District of Columbia shall have and perform the same powers and duties as the Metropolitan police of said District."

2  The Code omits the words "and statutory".

3  For the purpose of this section, the "term 'law enforcement officer' means an officer or member of the Metropolitan Police Department of the District of Columbia, or of any other police force operating in the District of Columbia; an investigative officer or agent of the United States," among others. D.C. Code § 23-501(2).

4  Specifically, the facts were as follows, *id.* at 354:

> At about 9:30 a.m. on ... a school day, appellant and two other young men were ... approximately a block away from a local high school. [An officer], in uniform, approached them and inquired if they were students at the school. Upon receiving an affirmative answer, and knowing that starting time at the school was 8:45 a.m., the officer directed the students to stand by the police car and to produce identification. The students replied they had none. The officer then sought information from them orally. Appellant refused to identify himself and began to use profanity. When he stated his intention to leave, the officer directed him to remain. After more profanity, appellant started to walk away. The officer forcibly restrained him and placed him in custody.

dispositive Louisiana jurisprudence, interference with an investigation alone does not constitute interference with an officer in the course of an arrest."); *id.* 153 n.2 (plaintiff referred to police officers as "big dummies"); *Webb v. Ethridge*, 849 F.2d 546, 550 (11th Cir. 1988) ("Nor should appellees have obtained summary judgment on the issue of qulaified immunity. Georgia courts have held at least since 1871 and as recently as 1985 that 'mere remonstrance or disagreement' with a police officer does not constitute obstruction. We conclude that Mr. Webb's right to be free of arrest if he 'merely remonstrated' with the police was clearly established at the time of his arrest and that a reasonable police officer would not have believed that an arrest *on Mr. Webb's version of the facts* was lawful.") (footnote omitted); *cf. id.* (noting that refusal to supply information necessary to complete citation might rise to obstruction).

Defendants' reliance on the decision in *Rogala v. District of Columbia*, 161 F.3d 44, 53-54 (D.C. Cir. 1998), (Mem. at 11-12) is misplaced, not only because Rogala predates C.L.D. and is not controlling authority on the meaning of the APO statute, but also because Rogala involved traffic stop in which the arrestee was a passenger who was arrested for interfering with the officer's conduct of a field sobriety test on the driver, not simply because the plaintiff in that case disobeyed an order.

### 2.   No Probable Cause to Arrest for Dog Off Leash

Defendant Rodacker cannot justify the arrest based on plaintiff's have custody of dogs that were not on leash. Arrest is not authorized the District's statutory leash law, D.C. Code § 8-1808(e) (2001), a point that defendant tacitly concedes. Defendant's reliance on the leash regulation codified at 24 D.C.M.R. § 900.3 (1996) is misplaced. Under clearly-established law, that regulation is void. In 1961, when they promulgated the regulation, the Commissioners of the District of Columbia had no authority to require dogs to be leashed. By its terms, the statute that

empowered the Commissioners to adopt leash regulations went into effect on October 13, 1961.

The Commissioners adopted the leash regulation on October 12, 1961. A municipal ordinance is

void if it is enacted before the municipality has received authority. The ordinance remains void

even if the municipality subsequently receives the necessary authority. The municipality cannot

act in anticipation of receiving authority, but must wait until it has present authority. Because the

leash regulation was never reenacted, it is void.

### a.   Arrest Is Not Authorized Under the Statutory Leash Law.

Section 9(e) of the Animal Control Act of 1979 requires dogs to be leashed on "any school

ground when school is in session" and on a "public recreation area, other than a dog park." *Id.*

§ 8-1808(e). The Animal Control Act prescribes strictly monetary penalties for its violation: $25

for the first offense, $50 for the second, and $100 thereafter. *Id.* § 8-1811. The only process

authorized is a notice of violation—*not* arrest. *Id.* 8-1813.

### b.   The 1961 Leash Regulation Is Void.

24 D.C.M.R. § 900.3 (1996) requires dogs to be leashed when on public space. The charged

regulation carries a penalty of a fine up to $300 or imprisonment up to 10 days. *Id.* § 900.9.

Those provisions of the D.C.M.R. codify a police regulation adopted on October 12, 1961 by the

former Commissioners of the District Columbia.[1] The Act of Congress that gave the

Commissioners authority to require dogs to be leashed is Public Law 87-227, 75 Stat. 498. The

first section of that Act authorized the Commissioners of the District of Columbia to "regulate

the keeping and leashing of dogs and to regulate or prohibit the running at large of dogs" and

---

1   Sections 2 and 4 of article 18 of the District of Columbia Police Regulations, adopted by Order No. 61-1734 (October 12, 1961) (copy attached hereto), *printed in* 8 D.C. REG. 97 (Oct. 30, 1961). Chapter 9 of title 24 of the District of Columbia Municipal Regulations was compiled by the District of Columbia Office of Documents and Administrative Issuances. Publication in the D.C.M.R. only creates a rebuttable presumption that a regulation was duly adopted. D.C. Official Code § 2-561 (2001).

authorized the imposition of criminal penalties.[1] Sections 2 and 3 amended two earlier statutes that permitted dogs wearing tax tags to "run[] at large." Section 4 provided that the Act "shall become effective thirty days after the date of its approval." President Kennedy signed the Act on September 13, 1961; therefore, by its terms, Public Law 87-227 became effective on October 13, 1961.

### (i)  To Be Valid, a Police Regulation Adopted by the Commissioners Must Have Been Authorized By Statute.

To be sustained, the leash regulation must be supported by a specific grant of authority to the Commissioners. The Commissioners governed the District from 1874 until the advent of home rule in 1975, under the organic Acts of June 20, 1874, 18 Stat. 116, and June 11, 1878, 20 Stat. 102. Those Acts constituted the District of Columbia a municipal corporation, and established the Commissioners as its governors. The organic Acts, however, gave the Commissioners administrative powers only, reserving to Congress the District's legislative powers. *See, e.g.*, *District of Columbia v. Bailey*, 171 U.S. 161, 175-76 (1898). "Undoubtedly, the commissioners have such powers only as have been delegated to them by Congress." *Smithson v. District of Columbia*, 42 App. D.C. 184, 185 (1914).  Therefore, to be sustained, a regulation passed by the Commissioners must be authorized by some particular Act of Congress.

### (ii) A Subsequent Grant of Authority Will Not Validate a Previously Void Regulation.

The absence of authority at the time a municipal regulation is adopted renders it a nullity. "Aside from a curative legislative act, the proposition is indisputable that no given ordinance can have force or vitality unless it emanates from power existing in the municipal corporation *at the time of its adoption*." 5 Eugene McQuillin, The Law of Municipal Corporations § 16:8, at 290 (3d

---

1   Presently codified to D.C. Official Code § 1-303.41 (2001).

ed. 2004 rev.) (footnotes omitted; emphasis added). "An invalid or illegal ordinance is wholly

inoperative. It is not made valid by an ordinance continuing in force all existing ordinances until

repealed or changed." 6 McQuillin § 20.01, at 3 (3d ed. 1998 rev.). Moreover, a "regulation

beyond the enabling act then in force does not become valid by the subsequent enactment of an

enabling act which is broad enough to support a similar regulation if one should be adopted

under it." *Commonwealth v. Rivkin*, 329 Mass. 586, 589, 109 N.E.2d 838 (1952); *accord*

*Edwards v. Borough of Moonachie*, 3 N.J. 17, 21, 68 A.2d 744 (1949):

> A subsequent grant of such authority, without more, does not serve to validate the measure. The mere inclusion of the power by legislative amendment does not give legal force to a prior local enactment void ab initio for want of such power. The amendment here is not in terms curative legislation, operating prospectively upon the invalid regulation. The validation of the ordinance was plainly not within legislative contemplation. And its subject matter was not re-enacted by the local legislative tribunal after the adoption of the amendment.

### (iii) The 1961 Leash Regulation Is Void Because It Was Adopted Before the Act Authorizing It Became Effective.

It is immaterial to the validity of the leash regulation that Public Law 87-227 had been slated

to become effective the day after the Commissioners acted to adopt the regulation:

> A statute may have a potential existence, although it will not go into operation until a future time, and until the time arrives when it is to take effect and be in force, a statute which has been passed by both houses of the legislature and approved by the executive has no force whatever for any purpose. Before that time, no rights may be acquired under it and no one is bound to regulate his or her conduct according to its terms, *and all acts purporting to have been done under it prior to that time are void.*[1]

As noted above, a subsequent grant of authority is ineffective to validate a municipal

ordinance void for want of authority. The rule holds true even where the legislation granting the

authority has been enacted, but, by its terms, has not yet gone into effect. On this point, *McClure*

*v. Township of Oxford*, 94 U.S. 429 (1876), is controlling.[2] *McClure* concerned the validity of

---

1  82 C.J.S. *Statutes* § 388, at 543 (footnotes omitted; emphasis added).
2   In 1876—as now—the Supreme Court of the United States was the highest court of the District of Columbia.

certain bonds issued by a municipality in order to purchase stock in a railroad. The state statute authorizing such bonds had been enacted on March 1, but by its terms did not go into effect until it had been published in a certain newspaper, identified by name. *Id*. at 432. That publication took place on March 21. *Id*. The state statute required that the municipality publish thirty days' notice of a special election to approve their issuance. *Id*. at 433. Because the special election had been held on April 8, the municipality must have acted to call the election no later than March 9 —eight days after the state authorizing statute had been enacted, but twelve days before it had become effective by publication. *Id*. Thus, the *McClure* Court held the bonds could not have been validly issued, although the election had been held and the bonds issued after the authorizing statute went into effect, because as of March 9 the municipality had no authority to act. *Id*. at 433.

It is also immaterial that in this case the Commissioners acted just one day in advance of receiving authority. In *United States v. Locke*, 471 U.S. 84 (1985), for example, the Court ruled that where a statute required federal mining claimants to file a notice of intention to hold their claims "prior to December 31" of every year, a notice filed *on* December 31 was necessarily too late. The Court explained that to "attempt to decide whether some date other than the one set out in the statute is the date actually 'intended' by Congress is to set sail on an aimless journey …." *Id*. at 93.

Congress expressly provided that the 1961 Dog Act not "become effective" until *thirty* days after its approval. It could as easily have provided that the Act take effect in twenty-nine days, or

*See* Rev. Stat., D.C. § 846 (1874) (review by Supreme Court of the United States of judgments of the Supreme Court of the District of Columbia same as of United States circuit courts); D.C. Code § 11-110(1)(A) (2001) ("The judicial power in the District of Columbia is vested in the following courts: … The Supreme Court of the United States."); *cf. Whalen v. United States*, 445 U.S. 684, 687-88 (1980) (noting that the Court defers to interpretations of District law by the District of Columbia Court of Appeals, but is not bound by them, and declining to follow the latter court's construction of an Act of Congress at issue in the case).

upon enactment, but it did not.[1] Whatever the reason for Congress' delaying the effective date for the enabling Act and the Commissioners' failure to observe it, the consequence is that the 1961 leash regulation is void.

### 3.  No Ground for Detaining Plaintiff After Booking

In *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), the Court held that the Fourth Amendment permitted arrest for a minor offense for the purposes of booking the suspect. In *Atwater*, the arrestee was released following booking. In this case, however, plaintiff was detained for more than twenty-four hours after booking was complete. Even defendant Rodacker admitted that but for the felony charge of Assault on Police Officer, plaintiff would have been released after booking. Therefore, the continued imprisonment cannot be justified by the misdemeanor dog-leash charge.

### 4.  Qualified Privilege Should Not Extend to Mistake of Law

There is no historical basis for a qualified privilege based on mistake of law. *See, e.g.*, *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178, 2 L. Ed. 243 (1804) (holding that instructions from the President of the United States regarding the execution of the defendant officer's statutory duties could not justify or excuse violation of the statute as construed by the Court); Cases and Authorities reproduced in Appendix II. The universal justification for the qualified privilege in

---

1   It is very possible that Congress intended that the Act's effective date be delayed so that residents of the District —who had no voice in the selection of Commissioners—could at least make known their views as to what form the resulting regulations should take. Significantly, in 1961, there was no Administrative Procedure Act requiring notice of regulations proposed by the Commissioners. The federal Administrative Procedure Act exempted the District. See id. § 2(a), 60 Stat. 237 (June 11, 1946) ("'Agency' means each authority … of the Government of the United States other than … the District of Columbia."). Congress did not enact the District of Columbia Administrative Procedure Act until 1968. See Pub. L. 90-614, 82 Stat. 1203 (Oct. 21, 1968). The lack of such procedures was, however, a known deficiency. See, e.g., A Bill to prescribe administrative procedures for the government of the District of Columbia, to require maintenance of an official publication for such government, and for other purposes, H.R. 5545, 85th Cong., 1st Sess. (introduced Mar. 4, 1957); Committee on the District of Columbia, House of Representatives, Hearing on Administrative Procedure Act for the District of Columbia (H.R. 5545), May 23, 1958 (unprinted typed transcript). Thus, Congress may well have thought it important that some time be afforded for comment, particularly since the 1961 Act authorized the Commissioners to establish criminal penalties for the violation of any regulations under the Act.

such cases—that it is unjust to the officer to hold him liable where the law was not "knowable" and to do so will cause him to shirk his lawful responsibilities—is nonsensical. The same result can—and should—be obtained by the government indemnifying the officer from general revenues. The qualified privilege simply makes the individual who was the victim of unlawful action the indemnifying party, thereby casting upon the few the cost of benefit for the many. Such a proceeding is counter to the genius of our Constitution and has no basis in reason or history.

### B.  Defendant Used Excessive Force Following Arrest

There is a clear factual dispute on the record adduced by opposing counsel herself regarding whether excessive force was used in connection with the arrest. Both defendant's Gerstein affidavit and plaintiff's Rule 118 affidavit aver that defendant used force on plaintiff after she had effected the arrest. Defendant states she "forced [plaintiff's] left arm behind his back in a compliance hold." Mem. Ex. 9. Plaintiff states defendant "took hold of one of my arms, twisted it behind my back, and pushed it upward to the point where I felt pain in my shoulder." Mem. Ex. 10, at ¶ 7. Where the affidavits differ—as shown above—is whether there had been any resistance on the part of plaintiff that would justify the use of that force.

## IV.  DEFENDANTS' RES JUDICATA AND STATUTE OF LIMITATIONS DEFENSES ARE FRIVOLOUS

### A.  The *Res Judicata* Argument Is Frivolous Because There Was No *Judicium*

As the party asserting issue preclusion, defendants have "the burden of showing that any issue in the present litigation as to which he seeks preclusion is identical to the one that was decided" earlier. *Hogue v. Hopper*, 728 A.2d 611, 615 (D.C. 1999). Defendants have not met that burden.

16

First, it is clearly established that collateral estoppel, or issue preclusion, arises only from a judicial decision. That is manifest from the authorities cited by opposing counsel, Mem. at 13 & 15 n.14,[1] as well as other recognized authorities. See, e.g., 18A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4443 (2d ed. 2002). Yet opposing counsel points to no judicial decision of any kind in her Memorandum. That is no doubt because there has in fact not been any judicial decision regarding the subject matter of this action. Therefore, opposing counsel's contention regarding collateral estoppel is objectively frivolous.

Opposing counsel is not saved by her reliance on the prosecutor's decision to enter a nolle prosequi in exchange for plaintiff's posting and forfeiting $25 security. In this regard, it particularly bears notice that, unlike Rule 48(a) of the Federal Rules of Criminal Procedure,[2] Rule 48(a)(1) of the Superior Court Rules of Civil Procedure[3] provides no role for the court in approving a dismissal of an information by the prosecution. Indeed, no rule of the Superior Court addresses post-and-forfeiture agreements, much less authorizes any sort of judicial decision concerning them. Thus, there is literally not even an opportunity for a judicial decision to be rendered in cases such as this.

---

1  Each of the examples of adjudication on other than the merits given by opposing counsel in footnote 14 presuppose a decision by the court (citations omitted; emphasis added):

   [I]n certain circumstances, a *court's decision* may be given preclusive effect independent of the merits of the underlying claim. For instance, a *court's decision* to dismiss a matter for lack of jurisdiction is given preclusive effect independent of the merits of the underlying claim. Further, in actions which in *involuntary* dismissals, the dismissals are deemed to be on the merits unless the trial court specifies otherwise. Similar a consent *judgment*, which issued based upon an agreement between the parties to settle a matter, is deemed a *judgment* on the merits. "It is aimed at ending the litigation with a *judgment* that is enforceable."

2  The first sentence of Fed. R. Crim. P. 48(a) provides (emphasis added): "The government may, *with leave of court*, dismiss an indictment, information, or complaint."

3  The first sentence of Super. Ct. R. Cr. P. 48(a)(1) provides (emphasis added): "The Attorney General or the United States attorney or the Corporation Counsel may file a dismissal or nolle prosequi of an information or complaint *and the prosecution shall thereupon terminate*."

Finally, D.C. Code § 5-335.01(b) (2005) (cited in opposing counsel's Memorandum) specifically provides that resolution of a charge by posting-and-forfeiting *cannot* be treated as a judgment. "The resolution of a criminal charge using the post-and-forfeit procedure is not a conviction of a crime *and shall not be equated to a criminal conviction*." *Id.* (emphasis added). So far from estopping plaintiff from litigating the merits of the underlying arrest, paragraph (d)(7) of that statute explicitly recognizes that a defendant may have his arrest record sealed, pursuant to Rule 118, Superior Court Rules of Criminal Procedure, by establishing that no offense was in fact committed. Opposing counsel simply has not and cannot point to any judicial decision concerning the subject matter of this action, much less one that would estop plaintiff.

In the District of Columbia, the high-water mark for issue preclusion based on payment of a fine is *Kovach v. District of Columbia*, 805 A.2d 957 (D.C. 2002), in which the plaintiff sought to recover the amount he had paid as fine for a traffic violation, based on the allegation that the mechanical device that detected the infraction was faulty. There, the court held that collateral estoppel applied where the plaintiff had paid the fine for running a red light without contesting the ticket before the Bureau of Traffic Adjudication. In *Kovach*, however, the court relied on the fact that "[u]nder the Traffic Adjudication Act, '[p]ayment of the fine for the infraction shall be deemed a finding of liability.' D.C. Code § 50-2302.05 (c)(1)." *Id.* at 962. Furthermore, the Kovach court noted that in a *tort* case—which Kovach was not—payment of the fine would *not* have been admissible even as evidence, much less preclusive. *Id.* at 962 n.6 (citing *Johnson v. Leuthongchak*, 772 A.2d 249 (D.C. 2001)).

In the present case, there was never an adjudication on which to base issue preclusion and the statute governing forfeiture of security affirmatively precludes construing such a forfeiture as an admission of guilt.

18

### B.  The Complaint Was Filed Within the Limitations Period

As pleaded in the Complaint, this action arises from defendant's arrest of plaintiff on February 20, 2005, after which plaintiff continued imprisoned for over thirty hours. Complaint[1] ¶¶ 2, 5.

### 1.  The Statute of Limitations Was Tolled for the Duration of the Imprisonment

It is clearly established under District of Columbia law that when a plaintiff's cause of action arises from his arrest and imprisonment, the time for bringing the action does not begin to run until the disability is removed by his release. D.C. Code § 12-302(a)(3) (2001); *see also, e.g.*, *District of Columbia v. Tinker*, 691 A.2d 57, 64 (D.C. 1997) ("There is no dispute that the statute was tolled by § 12-302(a)(3) *from the moment of [the plaintiff]'s arrest* ....") (emphasis added) (citing *Cannon v. District of Columbia*, 569 A.2d 595, 596 (D.C. 1990)). Because, as alleged in the Complaint, plaintiff was released more than twenty-four hours after his arrest on February 20, the limitations period did not start on that day.

### 2.  Monday, February 20, 2006, Was Washington's Birthday, a Legal Holiday

This action was commenced in the Superior Court of the District of Columbia on Tuesday, February 21, 2006. *See id.* (clerk's date stamp). That was the day after Washington's Birthday,[2] a day on which the court was closed.[3] It is well established that under Rule 6(a) of the Superior Court Rules of Civil Procedure, when the last day of a limitations period falls on a Saturday, Sunday, or holiday, a complaint is timely if filed on the next day the court is open.[4]

---

1  The Complaint was originally filed in the Superior Court of the District of Columbia. A copy is attached to the Defendants' Motion to Dismiss as Exhibit 11.

2  *See* 5 U.S.C. § 6103(a) ("The following are legal public holidays: ... Washington's Birthday, the third Monday in February."); Office of Personnel Management, "2006 Federal Holidays," http://www.opm.gov/fedhol/2006.asp (visited Aug. 6, 2006).

3  Rule 6(a), Superior Court Rules of Civil Procedure.

4  *E.g.*, *Banks v. Chesapeake & Potomac Tel. Co.*, 256 U.S. App. D.C. 22, 24, 802 F.2d 1416, 1418 (1986); *Easter Seal Society v. Berry*, 627 A.2d 482 (D.C. 1993); *Poole v. Lowe*, 615 A.2d 589, 592 n.6 (D.C. 1992).

**V.   CONCLUSION**

Defendants' Motion to Dismiss should be denied. The United States should be dismissed as a party and the case should proceed against defendant Rodacker individually as to all claims. A proposed order is attached to this memorandum.

Dated: November 6, 2006

                                                Respectfully submitted,


                                                /s/ Michael F. Wasserman
                                                Plaintiff, *pro se*
                                                D.C. Bar No. 442898
                                                9355 Tovito Dr.
                                                Fairfax, VA 22031-3824
                                                (703) 591-0807
                                                mfwddc@gmail.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael F. Wasserman

     vs.                       Civil Action No. 06-1005 (RWR)

Denise Rodacker, *et al.*

## STATEMENT OF MATERIAL FACTS AS TO
## WHICH THERE EXISTS A GENUINE ISSUE

Pursuant to Local Civil Rules 7(h) and 56.1 and the court's Order [21] of August 10, 2006,

plaintiff, Michael F. Wasserman, submits this "separate concise statement of genuine issues

setting forth all material facts as to which it is contended there exists a genuine issue necessary to

be litigated, ... includ[ing] references to the parts of the record relied on to support the

statement."

1.  On Sunday morning, Feburary 20, 2005, plaintiff Michael Wasserman was walking his dogs

    in Montrose Park. Wasserman Affidavit Motion Ex. 10[1] ¶¶ 1.

2.  Defendant Denise Rodacker called out from behind plaintiff to ask whether he would answer

    some questions, without specifying the nature or reason for the questions. Wasserman

    Affidavit, Motion Ex. 10, ¶ 2-3. *Contra* Defendants' Statement of Material Facts Not in

    Genuine Dispute[2] ("DSOM") ¶ 3.

3.  Plaintiff asserted to defendant Rodacker that he was not obliged to answer her questions and

    continued on his walk in a direction away from defendant Rodacker. Wasserman Affidavit,

    Motion Ex. 10, ¶ 3.

4.  While plaintiff continued walking, defendant Rodacker ran to catch up to him, during which

    time they debated whether plaintiff was obliged to answer defendant's questions. Wasserman

    Affidavit, Motion Ex. 10, ¶ 4.

---

1  *I.e.*, Exhibit 10 attached to the Memorandum in Support of Defendants' [17] Motion to Dismiss.
2  Attached to Defendants' [24] Memorandum in Opposition to Motion to Strike.

5. After catching up to him, defendant Rodacker arrested plaintiff by placing her hand on his left shoulder.  Wasserman Affidavit, Motion Ex. 10, ¶ 5.

6. As soon as defendant Rodacker arrested him, plaintiff stopped completely and stood perfectly still, facing in the direction of his former travel and away from defendant Rodacker. Wasserman Affidavit, Motion Ex. 10, ¶ 5; Wasserman Declaration, Opp. Ex. A, ¶ 6.

7. After defendant Rodacker arrested him, she told plaintiff, in response to his inquiry, that he was under arrest for "resisting arrest." Wasserman Affidavit, Motion Ex. 10, ¶ 7.

8. Neither plaintiff nor any person or animal at any time offered any violence or physical resistance to defendant Rodacker or to any other person. Wasserman Affidavit, Motion Ex. 10, ¶¶ 5, 9, 10; Wasserman Declaration, Opp. Ex. A, ¶ 6. *Contra* Defendants' SOM, ¶ 3.

9. Defendant Rodacker at no time expressed an intent to issue a citation to plaintiff for failing to have his dogs on a leash. Wasserman Affidavit, Motion Ex. 10, ¶¶ 3, 4, 7; Wasserman Declaration, Opp. Ex. A, ¶ 5.

10. Defendant Rodacker never told plaintiff that he was under arrest for having his dogs off leash. Wasserman Affidavit, Motion Ex. 10, ¶ 7; Wasserman Declaration, Opp. Ex. A, ¶ 7. *Contra* Defendants' SOM, ¶ 4.

11. After arresting him, defendant Rodacker's only questions to plaintiff before arriving at the station for booking were (1) whether he was carrying any weapons and (2) whether he wanted his friends to take custody of his dogs. Wasserman Affidavit, Motion Ex. 10, ¶ 11.

12. The United States Park Police, including defendant Rodacker, do not effect arrests for the purpose of charging violations of the leash laws. Fletcher Declaration, Opp. Ex. B, ¶¶ 4-12; Ihnat Declaration, Opp. Ex. C, ¶¶ 2-4 & attachment; DSOM, ¶¶ 8, 9.

13. Defendant Rodacker arrested plaintiff not because he had dogs off leash, but solely because plaintiff had declined her request to speak with her, said that he was not obliged to speak with her, and walked away from her. *Id.*; Wasserman Affidavit, Motion Ex. 10, ¶¶ 2-4, 7, 11; Wasserman Declaration, Opp. Ex. A, ¶¶ 5, 7. *Contra* Defendants' SOM, ¶ 4.

14. Defendant Rodacker used unnecessary force against plaintiff after he was under arrest by twisting his arm behind his back and pushing it upward and by handcuffing him behind his back while he was being transported in her squad car. Wasserman Affidavit, Motion Ex. 10, ¶¶ 5, 7, 9, 10; Wasserman Declaration, Opp. Ex. A, ¶¶ 6, 8.

15. Plaintiff would have been released from the Rock Creek Station after booking on the morning of Sunday, February 20, 2005, had defendant Rodacker not charged him with the felony offense of Assault on a Police Officer, under D.C. Code § 22-405. Wasserman Affidavit, Motion Ex. 10, ¶ 7; Wasserman Declaration, Opp. Ex. A, ¶ 10.

16. Plaintiff was continuously imprisoned from the time defendant Rodacker placed him under arrest until he was released on Monday, February 21, 2005, at 3:00 p.m., on personal recognizance after initial appearance in the Superior Court of the District of Columbia. Wasserman Declaration, Opp. Ex. A, ¶ 13. *Cf.* Defendants' SOM, ¶ 5.

17. The Office of the United States Attorney for the District of Columbia never filed any charge against plaintiff. Mem. in Support of [17] Defendants' Motion to Dismiss at 5 n.5; Wasserman Declaration, Opp. Ex. A, ¶ 14.

18. The Office of the Attorney General for the District of Columbia filed a one count information charging plaintiff with a single violation of 24 D.C.M.R. § 900.3 (1996) for having a dog off leash on public space. Wasserman Declaration, Opp. Ex. A, ¶ 15 & attachment. *Contra* Defendants' SOM, ¶ 5.

3

19. At his arraignment on March 16, 2005, plaintiff pleaded not guilty to the information filed on

behalf of the District of Columbia. Wasserman Declaration, Opp. Ex. A, ¶ 16.

20.  On May 23, 2005, the Office of the Attorney General for the District of Columbia agreed to

enter a nolle prosequi upon plaintiff's posting and forfeiting $25 security. There were no

other terms to the agreement. In particular, plaintiff did not agree to forego any civil remedy

that he might have arising from the arrest, battery and imprisonment. Wasserman

Declaration, Opp. Ex. A, ¶ 17. *Cf.* Defendants' SOM ¶ 6.

21. After defendant posted and forfeited $25 security, the prosecution entered a nolle prosequi.

Wasserman Declaration, Opp. Ex. A, ¶ 18.

22. No judge approved of or otherwise acted upon either the agreement or the nolle prosequi.

Wasserman Declaration, Opp. Ex. A, ¶ 18.

Dated: October 11, 2006

Respectfully submitted,


/s/ Michael F. Wasserman
Plaintiff, *pro se*
D.C. Bar No. 442898
9355 Tovito Dr.
Fairfax, VA 22031-3824
(703) 591-0807
mfwddc@gmail.com