UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Michael F. Wasserman

     vs.                           Civil Action No. 06-1005 (RWR)

Denise Rodacker, *et al.*

**APPENDIX II TO MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS [17]**

    These materials relate to plaintiff's claim that there is no historical basis for a qualified

immunity based on mistake of law.

    For an explanation of the abbreviations used in the sources, see, *e.g.*, *Table of Abbreviations*

*Used in Jurisprudence* in 1 Benjamin V. Abbott, Dictionary of Terms and Phrases Used in

American or English Jurisprudence viii-xliii (1878); see also Law Reports and Abbreviations

Database at the University of New South Wales Freehills Law Library.

    Dated: November 6, 2006

                             Respectfully submitted,

                             Michael F. Wasserman
                             Plaintiff, *pro se*
                             D.C. Bar No. 442898
                             9355 Tovito Dr.
                             Fairfax, VA 22031-3824
                             (703) 591-0807
                             mfwddc@gmail.com

*Clark v. Gape*, 5 Co. 64a, 77 Eng. Rep. ___ (C.P. 1596)

*Clarkes case.*[1]

En action de *Faux imprisonment* port per Clarke vers Gape: Le defendant justifie le imprisonment, pur ceo que le Roy *E.6.* encorporate le ville de S. Albons per nosme de Maior &c. & graunt a eux a faire ordinances, & monstre que le Roigne appointe le *Terme* destre tenus la, per que ils per lassent le plaintiff, & des auters Burgesses, assesse un somme sur chescun inhabitaunt pur les charges in erecting des courts la, & ordeine, que si ascun refusera a paier &c. que il serra imprison &c. & pur ceo que le plaintiff esteant burgesse &c. refuse a paier &c. il come Maior iustifie; & fuit adiudge nul plea. Car cest ordinance est encounter lestatute *de magna Charta cap. 29. Nullus liber homo imprisonetur:* Quel act ad estre confirme, & establie oustre *30.* foits, & lassent le plaintiff ne poit alter le ley in tiel case. Mes fuit resolve, que ils poyent aver inflicte reasonable penaltie, mes nemy imprisonment, quel penalty ils poyent limit destre levie per distress, ou pur que action de dette gist, et le plaintife ad Judgement.

[1] From the first edition, 1605.

*Clark's Case.*[2]

In an action of false imprisonment brought by Clark against Gape; the defendant justified the imprisonment, because King E. 6. incorporated the town of St. Alban's by the name of Mayor, &c. and granted to them to make ordinances; and shewed, that the Queen appointed the term to be kept there, and that they with the assent of the plaintiff and other burgesses, did assess a sum on every inhabitant for the charges in erecting the courts there; and ordained, that if any should refuse to pay, &c. that he should be imprisoned, &c. and because the plaintiff being a burgess, &c. refused to pay, &c. he as Mayor justified; and it was adjudged no plea, for this ordinance is against the statute of *Magna Charta, cap.* 29. *Nullus liber homo imprisonetur;* which act hath been confirmed and established above thirty times, and the plaintiff's assent cannot alter the law in such case; but it was resolved, that they might have inflicted a reasonable penalty, but not imprisonment, which penalty they might limit to be levied by distress, or for which an action of debt lay; and the plaintiff had judgment.

[2] From the last edition, 1826 (editors' notes omitted).

Trial of Slingsby Bethel for an Assault and Battery, 8 S.T. 748, 758 (1681)

Holt [counsel for the King]. ... Next I come to the point of law, how a man that is a candidate at an election, can beat any man that stands in his way; I do not understand that to be law. If any man had beaten Mr. Bethel, he might have beaten him again in his own defence; but there was no such thing, Mr. Bethel saw no disturbance himself, but was informed of it, and so became too officious; though he was sheriff of London, yet he was no officer there [*i.e.*, in Southwark]; for he was not a constable there; and it was a constable's office, and he only could have seized him [*i.e.*, the complaining witness]; and not a constable neither, unless he had seen the king's peace broken.

7 James I, c. 5 (1609), 2 THE STATUTES AT LARGE 566 (John Cay, ed., 1758)

An Act for Ease in pleading troublesome and contentious Suits prosecuted against Justices of the Peace, Mayors, Constables, and certain other his Majesty's Officers, for the lawful Execution of their Office.

For Ease in pleading against many causeless and contentious Suits which have been, and daily are commenced against Justices of Peace, Mayors or Bailiffs of Cities and Towns Corporate, Headboroughs, Port-Reves, Constables, Tithingmen, Collectors of Subsidies and Fifteens, who for due Execution of their Office have been troubled and molested, and still are like to be troubled and molested, by evil-disposed contentious Persons, to their great Charge and Discouragement in doing of their Offices:

Be it therefore enacted by our Sovereign Lord the King, and by the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the Authority of the same, That if any Action, Bill, Plaint or Suit, upon the Case, Trespass, Battery or false Imprisonment, shall be brought after forty Days next after the End of this Session of Parliament, in any of his Majesty's Courts at Westminster or elsewhere, against any Justice of Peace, Mayor or Bailiff of City or Town Corporate, Headborough, Port-Reve, Constable, Tithingman, Collector of Subsidy or Fifteenths, for or concerning any Matter, Cause or Thing, by them or any of them done by Virtue or Reason of their or any of their Office or Offices, That it shall be lawful to and for every such Justice of Peace, Mayor, Bailiff, Constable or other Officer or Officers before named, and all others which in their Aid or Assistance, or by their Commandment, shall do any Thing touching or concerning his or their Office or Offices, to plead the general Issue, that he or they are not guilty, and to give such Special Matter in Evidence to the Jury which shall try the same, which Special Matter being pleaded had been a good and sufficient Matter in Law to have discharged the said Defendant or Defendants of the Trespass, or other Matter laid to his or their Charge: And that if the Verdict shall pass with the said Defendant or Defendants in any such Action, or the Plaintiff or Plaintiffs therein become Nonsuit, or suffer any Discontinuance thereof, That in every such Case the Justices or Justice, or such other Judge before whom the said Matter shall be tried, shall by Force and Virtue of this Act allow unto the Defendant or Defendants his or their double Costs, which he or they shall have sustained by Reason of their wrongful Vexation in Defence of the said Action or Suit; for which the said Defendant or Defendants shall have like Remedy as in other Cases where Costs by the Laws of this Realm are given to the Defendants. And this Act to continue for seven Years, and from thence to the End of the next Parliament after the said seven Years.

21 James I, c. 12 (1623), 2 THE STATUTES AT LARGE 584 (John Cay, ed., 1758)

An Act to enlarge and make perpetual the Act made for Ease in Pleading against troublesome and contentious Suits prosecuted against Justices of the Peace, Mayors, Constables and certain other his Majesty's Officers, for the lawful Execution of their Office, made in the seventh Year of his Majesty's most happy Reign.

Whereas an Act, intitled, *An Act for Ease in Pleading against troublesome and contentious Suits prosecuted against Justice of the Peace, Mayors, Constables, and certain other his Majesty's Officers, for the lawful Execution of their Office, made in the seventh Year of his Majesty's most happy Reign of* England, was made to continue but for seven Years, and from thence to the End of the next Parliament after the said seven Years, which by Experience hath since been found to be a good and profitable Law:

II. Be it therefore enacted by the King's most excellent Majesty, the Lords Spiritual and Temporal, and the Commons, in this present Parliament assembled, and by the Autority of the same, That the said Act shall from and after the End of this present Session of Parliament be perpetual and have Continuance for ever.

III. And be it further enacted by the Authority aforesaid, That all Churchwardens, and all Persons called Sworn-Men, executing the Office of Churchwardens, and all Overseers of the Poor, and all others which in their Aid and Assistance, or by their Commandment, shall do any Thing touching or concerning his or their Office or Offices, shall hereafter be enabled to receive and have such Benefit and Help by Virtue of the said Act, to all Intents, Constructions and Purposes, as if they had been specially named therein.

IV. And whereas notwithstanding the said Statute, the Plaintiff is at Liberty to lay his Action which he shall bring against any Justice of Peace, or other Officer, in any foreign County at his Choice, which hath proved very inconvenient unto sundry of the Officers and Persons aforesaid, that have been impleaded by some contentious and troublesome Persons in Countries far remote from their Places of Habitations:

V. Be it therefore further enacted by the Authority aforesaid, That if any Action, Bill, Plaint, or Suit upon the Case, Trespass, Battery or false Imprisonment, shall be brought after the End of this present Session of Parliament, against any Justice of Peace, Mayor or Bailiff of City, or Town Corporate, Headborough, Portreve, Constable, Tithing-Man, Collector of Subsidy or Fifteens, Churchwardens, and Persons called Sworn-Men, executing the Office of Churchwarden or Overseer of the Poor, and their Deputies, or any of them, or any other which in their Aid and Assistance, or by their Commandment, shall do any Thing touching or concerning his or their Office or Offices, for or concerning any Matter, Cause or Thing, by them or any of them done by Virtue or Reason of their or any of their Office or Offices, that the said Action, Bill, Plaint or Suit shall be laid within the County where the Trespass or Fact shall be done and committed, and not elsewhere; and that it shall be lawful to and for all and every Person and Persons aforesaid, to plead thereunto the general Issue, that he or they are not guilty, and to give such special Matter in Evidence to the Jury which shall try the same, as in or by the said former Act is limited or declared: And that if upon the Trial of any such Action, Bill, Plaint or Suit, the Plaintiff or Plaintiffs therein shall not prove to the Jury which shall try the same, that the Trespass, Battery, Imprisonment, or other Fact or Cause of his, her, or their such Action, Bill, Plaint or Suit was or were had, made, committed or done, within the County wherein such Action, Bill, Plaint or

Suit shall be laid; that then in every such Case, the Jury which shall try the same, shall find the Defendant and Defendants in every such Action, Bill, Plaint or Suit, not guilty, without having any Regard or Respect to any Evidence given by the Plaintiff or Plaintiffs therein, touching the Trespass, Battery, Imprisonment, or other Cause for which the same Action, Bill, Plaint or Suit, is or shall be brought: And if the Verdict shall pass with the Defendant or Defendants in any such Action, Bill, Plaint or Suit, or the Plaintiff or Plaintiffs therein become Nonsuit, or suffer any Discontinuance thereof, that in every such Case the Defendant or Defendants shall have such double Costs, and all other Advantages and Remedies, as in and by the said former Act is limited, directed or provided.

24 George II, c. 44 (1751), 6 The Statutes at Large 66-67 (John Cay, ed., 1758)

An Act for the rendering Justices of the Peace more safe in the Execution of their Office; and for indemnifying Constables and others acting in Obedience to their Warrants.

Whereas Justices of the Peace are discouraged in the Execution of their Office by vexatious Actions brought against them for or by reason of small and involuntary Errors in their Proceedings: And whereas it is necessary that they should be (as far as is consistent with Justice, and the Safety and Liberty of the Subjects over whom their Authority extends) rendered safe in the Execution of the said Office and Trust: And whereas it is also necessary that the Subjects should be protected from all wilful and oppressive Abuse of the several Laws and Statutes committed to the Care and Execution of the said Justices of the Peace;

Be it enacted by the King's most excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal and Commons in this present Parliament assembled, and by the Authority of the same, That from and after the twenty-fourth Day of June one thousand seven hundred and fifty-one, no Writ shall be sued out against, nor any Copy of any Process, at the Suit of a Subject, shall be served on any Justice of the Peace for any Thing by him done in Execution of his Office, until Notice in Writing of such intended Writ or Process shall have been delivered to him, or left at the usual Place of his Abode, by the Attorney or Agent for the Party who intends to sue or cause the same to be sued out or served, at least one Calendar Month before the suing out or serving the same; in which Notice shall be clearly and explicity contained the Cause of Action which such Party hath or claimeth to have against such Justice of the Peace; on the Back of which Notice shall be indorsed the Name of such Attorney or Agent, together with the Place of his Abode, who shall be intitled to have the Fee of twenty Shillings for the preparing and serving such Notice, and no more.

II. And be it further enacted, That it shall and may be lawful to and for such Justice of the Peace, at any Time, within one Calendar Month after such Notice given as aforesaid, to tender Amends to the Party complaining, or to his or her Agent or Attorney; and in case the same is not accepted, to plead such Tender in Bar to any Action to be brought against him, grounded on such Writ or Process, together with the Plea of Not guilty, and any other Plea with the Leave of the Court; and if upon Issue joined thereon the Jury shall find the Amends so tendered to have been sufficient, then they shall give a Verdict for the Defendant; and in such Case, or in case the the Plaintiff shall become Nonsuit, or shall discontinue his or her Action, or in case Judgment shall be given for such Defendant or Defendants upon Demurrer, such Justice shall be intitled to the like Costs as he would have been intitled unto, in case he had pleaded the General Issue only; and if upon Issue so joined the Jury shall find that no Amends were tendered, or that the same were not sufficient, and also against the Defendant or Defendants on such other Plea or Pleas, then they shall give a Verdict for the Plaintiff, and such Damages as they shall think proper, which he or she shall recover, together with his or her Costs of Suit.

III. And be it further enacted, That no such Plaintiff shall recover any Verdict against such Justice in any Case where the Action shall be grounded on any Act of the Defendant, as Justice of the Peace, unless it is proved upon the Trial of such Action, that such Notice was given as aforesaid; but in Default thereof such Justice shall recover a Verdict and Costs as aforesaid.

IV. And be it further enacted by the Authority aforesaid, That in case such Justice shall neglect to tender any Amends, or shall have tendered insufficient Amends, before the Action brought, it shall and may be lawful for him, by Leave of the Court where such Action shall depend, at any Time before Issue joined to pay into Court such Sum of Money as he shall see fit; whereupon such Proceedings, Orders and Judgments shall be had, made and given in and by such Court, as in other Actions where the Defendant is allowed to pay Money into Court.

V. And be it further enacted, That no Evidence shall be permitted to be given by the Plaintiff on the Trial of any such Action as aforesaid, of any Cause of Action, except such as is contained in the Notice hereby directed to be given.

VI. And be it further enacted by the Authority aforesaid, That from and after the said twenty-fourth Day of June one thousand seven hundred and fifty-one, no Action shall be brought against any Constable, Headborough or other Officer, or against any Person or Persons acting by his Order and in his Aid, for any thing done in Obedience to any Warrant under the Hand or Seal of any Justice of the Peace, until Demand hath been made or left at the usual Place of his Abode, by the Party or Parties intending to bring such Action, or by his, her or their Attorney or Agent, in Writing, signed by the Party demanding the same, of the Perusal and Copy of such Warrant, and the same hath been refused or neglected for the Space of six Days after such Demand; and in case after such Demand and Compliance therewith, by shewing the said Warrant to, and permitting a Copy to be taken thereof by the Party demanding the same, any Action shall be brought against such Constable, Headborough or other Officer, or against such Person or Persons acting in his Aid for any such Cause as aforesaid, without making the Justice or Justices who signed or sealed the said Warrant, Defendant or Defendants, that on producing and proving such Warrant at the Trial of such Action, the Jury shall give their Verdict for the Defendant or Defendants, notwithstanding any Defect of Jurisdiction in such Justice or Justices; and if such Action be brought jointly against such Justice or Justices, and also against such Constable, Headborough or other Officer, or Person or Persons acting in his or their Aid as aforesaid, then on Proof of such Warrant the Jury shall find for such Constable, Headborough or other Officer, and for such Person and Persons so acting as aforesaid, notwithstanding such Defect of Jurisdiction as aforesaid; and if the Verdict shall be given against the Justice or Justices, that in such Case the Plaintiff or Plaintiffs shall recover his, her or their Costs against him or them, to be taxed in such Manner by the proper Officer, as to include such Costs as such Plaintiff or Plaintiffs are liable to pay to such Defendant or Defendants for whom such Verdict shall be found as aforesaid.

VII. Provided always, That where the Plaintiffs in any such Action against any Justice of the Peace shall obtain a Verdict, in case the Judge before whom the Cause shall be tried shall in open Court certify on the Back of the Record, that the Injury for which such Action was brought, was wilfully and maliciously committed, the Plaintiff shall be intitled to have and receive double Costs of Suit.

VIII. Provided also, and be it enacted by the Authority aforesaid, That no Action shall be brought against any Justice of the Peace for any thing done in the Execution of his Office, or against any Constable, Headborough or other Officer, or Person acting as aforesaid, unless commenced within six Calendar Months after the Act committed.

*R. v. Palmer*, 2 Burr. 1162, 9_ Eng. Rep. ___ (K.B. 1761)

Rex *vers.* Palmer and Baine Esquires et al'.

*Wednesday* 22d *April* 1761.

  Upon shewing Cause Why an Information should not be granted against two Justices of Peace and Others, for a Misdemeanour, relating to the Conviction of a Poacher, and the Circumstances attending it;

  THE COURT thought proper, upon fully hearing and considering all the Affidavits and what was urged by the Counsel on both Sides, to *discharge* the Rule, as to *All* the Defendants; with COSTS *to be paid to the* JUSTICES, but without Costs as to the *Others*.

  And They were, upon this Occasion, most explicit in their Declaration, "That even where a Justice of the Peace acts *illegally*," (which, however, was not the present Case,) "Yet if He has acted *honestly* and candidly, *without* Oppression, Malice, Revenge, or any bad View or *ill Intention* whatsoever, The Court will never punish Him in this *extraordinary* Course of an INFORMATION; but leave the Party complaining, to their [*sic*] *ordinary* legal Remedy or Method of Prosecution, by Action or by Indictment.

*Huckle v. Money*, 2 Wilson 205, 95 Eng. Rep. 768 (C.P. 1763)

TRESPASS, assault and imprisonment; issue joined upon the general issue Not guilty, tried before the Lord Chief Justice, when it was proved for the plaintiff that he is a journeyman printer, and was taken in to custody by the defendant (a King's messenger) upon suspicion of having printed the *North Briton*, number 45; that the plaintiff kept him in custody about six hours, but used him very civilly by treating him with beef steakes and beer, so that he suffered very little or no dmages; the defendant attempted to justify under the general warrant of a secretary of state, to apprehend the printers and publishers of the said *North Briton*, number 45. (which is before set forth at length in the case of *The King* and *Wilkes*, *Easter term* 3 *Geo*. 3.) by virtue of the *stat*. of *Jac*. 1. and the *stat*. 24 *Geo*. 2. *cap*. 44. but was over-ruled by the Lord Chief Justice; whereupon the King's counsel who were advocates for the defendants tendered a bill of exceptions, which has not yet been argued; the jury gave 300 *l.* damages.

It was now moved by serjeant *Whitaker* that the verdict might be set aside and a new trial had; for that it appeared upon the evidence the plaintiff was only a journeyman to *Leech* the printer at the weekly wages of a guinea,[*] that he was confined but a few hours, and very civilly and well treated by the defendant, so that 300 *l.* were most outrageous damages in this case, and a new trial he hoped would be granted; and cited *Chambers* v. *Robinson*, 1 *Stra*. 691. which was an action for a malicious prosecution upon an indictment wherein the jury gave 1000 *l.* damages; several other similar cases were cited to induce the court to grant a new trial

**[2 Wils. *206]**

Serjeant *Burland* for the plaintiff, insisted that in cases of *Tort*, which sound merely in damages, and are not like *debt* or *assumpsit*, the court will never interpose in setting aside verdicts for excessive damages; that in the case of *Leeman* against *Allen* and others reforming constables, *C.B.* in an action of trespass and imprisonment, the jury gave 300 *l.* damages; and this court refused to grant a new trial, though the plaintiff had not been imprisoned above 24 hours. And in a late case in *B.R.* for criminal conversation 500 *l.* damages were given against a man in very poor circumstances, as appeared to the court by affidavit, and yet they would not grant a new trial, but said they could not interpose in cases of tort, unless the damages were very outrageous; but that the jury were the sole judges of the damages.

Lord Chief Justice: In all motions for new trials, it is as absolutely necessary for the court to enter into the nature of the case, as for a jury; the law has not laid down what shall be the measure of damages in actions of *tort*; the measure is vague and uncertain, depending upon a vast variety of causes, facts, and circumstances; *torts* or injuries which may be done by one man to another are infinite; in cases of criminal conversation, battery, imprisonment, slander, malicious prosecutions, *&c*. the state, degree, quality, trade or profession of the party injured, as well as of the person who did the injury, must be and generally are considered by a jury in giving damages; the few cases to be found in the books of new trials for *torts*, shews that courts of justice have most commonly set their faces against them; and the courts interfering in these cases would be laying aside juries;

---

\*    [A *guinea* was a gold coin worth twenty-one shillings.]

before the time of granting new trials, there is no instance that the judges ever intermeddled with the damages.

I shall now state the nature of this case, as it appeared upon the evidence at the trial; a warrant was granted by Lord *Halifax*, secretary of state, directed to four messengers, to apprèhend and seize the printers and publishers of a paper called the *North Briton*, number 45. without any information or charge laid before the secretary of state, previous to the granting thereof, and without naming any person whatsoever in the warrant; *Carrington*, the first of the messengers to whom the warrant was directed, from some private intelligence he had got that *Leech* was the printer of the *North Briton* number 45. directed the defendant to execute the warrant upon the plaintiff (one of *Leech*'s journeymen), and took him into custody for about six hours, and during that time treated him well, the personal injury done to him was very small, so that if the jury had been confined by their oath to consider the mere personal injury only, perhaps 20 *l.* damages would have been thought damages sufficient; but the small injury done to the plaintiff, or the inconsiderable-ness **[2 Wils. *207]** of his station and rank in life did not appear to the jury in that striking light, in which the great point of law touching the liberty of the subject appeared to them at the trial; they saw a magistrate over the King's subjects, exercising arbitrary power, violating *Magna Charta*, and attempting to destroy the liberty of the kingdom, by insisting upon the legality of this general warrant before them; they heard the King's counsel, and saw the solicitor of the treasury, endeavouring to support and maintain the legality of the warrant in a tyrannical and severe manner; these are the ideas which struck the jury on the trial, and I think they have done right in giving exemplary damages; to enter a man's house by virture of a nameless warrant, in order to procure evidence, is worse than the *Spanish* inquisition; a law under which no *Englishman* would wish to live an hour; it was a most daring public attack made upon the liberty of the subject: I though that the 29th chapter of *Magna Charta, Nullus liber homo capiatur vel imprisonetur, &c. nec super eum ibimus, &c. nisi per legale judicium parium suorum vel per legem terræ, &c.* which is pointed against arbitrary power, was violated. I cannot say what damages I should have given if I had been upon the jury; but I directed and told them they were not bound to any certain damages, against the solicitor general's argument. Upon the whole I am of opinion the damages are not excessive; and that it is very dangerous for the judges to intermeddle in damages for *torts*; it must be a glaring case indeed of outrageous damages in a *tort*, and which all mankind at first blush must think so, to induce a court to grant a new trial for excessive damages.

*Bathurst* Justice: I am of my Lord's opinion, and particularly in the matter of damages wherein he directed the jury that they were not bound to certain damages; this is a motion to set aside 15 verdicts in effect; for all the other persons who have brought actions against these messengers, have had verdicts for 200 *l.* in cause by consent, after two of the actions were fully heard and tried. *Clive* Justice absent.

*Per Curiam*, new trial refused.

*Entick v. Carrington*, 2 Wilson 275, 291-92, 19 S.T. 1029, 1067-68 (C.P. 1765)

**[2 Wils. *291]**

The defendants have no right to avail themselves of the usage of these warrants since the revolution, and if that would have justified them they have not averred it in their plea, so it could not be put, nor was in issue, at the trial; we can safely say there is no law in this country to justify the defendants in what they have done; if there was, it would destroy all the comforts of society; for papers are often the dearest property a man can have. This case was compared to that of stolen goods; Lord *Coke* denied the lawfulness of granting warrants to search for stolen goods, 4 *Inst*. 176, 177. though now it prevails to be law; but in that case the justice and the informer must proceed with great caution; there must be an oath that the party has had his goods stolen, and has strong reason **[2 Wils. *292]** to believe they are concealed in such a place; but if the goods are not found *there*, he is a trespasser, the officer in that case is a witness, there are none in this case, no inventory taken; if it had been legal many guards of property would have attended it. We shall now consider the usage of these warrants since the revolution; if it began then it is too modern to be law; the common law did not begin with the revolution, the ancient constitution which had been almost overthrown and destroyed, was then repaired and revived, the revolution added a new buttess to the ancient venerable edifice; the *K.B.* lately said that no objection had ever been taken to general warrants, they have past *sub silentio*; this is the first instance of an attempt to prove a modern practice of a private office to make and execute warrants to enter a man's house, search for and take away all his books and papers in the first instance, to be law, which is not to be found in our books. It must have been the guilt or poverty of those upon whom such warrants have been executed, that deterred or hindred them from contending against the power of a secretary of state and the solicitor of the treasury, or such warrants could never have passed for lawful till this time.

**[19 S.T. *1067]**

I come now to the practice since the Revolution, which has been strongly ureged, with this emphatical addition, that an usage tolertated from the æra of liberty, and continued downwards to this time through the best ages of the constitution, must necessarily have a legal commencement. Now, though that pretence can have no place in the question made by this plea, because no such practice is there alleged; yet I will permit the defendant for the present to borrow a fact from the special verdict, for the sake of giving it an answer.

If the practice began then, it began too late to be law now. If it was more ancient, the Revolution is not to answer for it; and I could **[19 S.T. *1068]** have wished, that upon this occasion the Revolution had not been considered as the only basis of our liberty.

The Revolution restored this constitution to its first principles. It did no more. It did not enlarge the libery of the subject; but gave it a better security. It neither widened nor contracted the foundation, but repaired, and perhaps added a buttress or two to the fabric; and if any minister of state has since deviated from the principles at that time recognized, all that I can say is, that, so far from being sanctified, they are condemned by the Revolution.

With respect to the practice itself, if it goes no higher, every lawyer will tell you, it is much too modern to be evidence of the common law; and if it should be added, that these warrants ought to acquire some strength by the silence of those courts, which have heard them read so often upon returns without censure or animadversion, I am able to borrow my answer to that pretence from the Court of King's-bench, which lately declared with great unanimity in the Case of General Warrants, that as no objection was taken to them upon the returns, and the matter passed *sub silentio*, the precedents were of no weight. I most heartily concur in

that opinion; and the reason is more pertinent here, because the Court had no authority in the present case to determine against the seizure of papers, which was not before them; whereas in the other they might, if they had thought fit, have declared the warrant void, and discharged the prisoner *ex officio*.

This is the first instance I have met with, where the ancient immemorable law of the land, in a public matter, was attempted to be proved by the practice of a private office.

The names and rights of public magistrates, their power and forms of proceeding as they are settled by law, have been long since written, and are to be found in books and records. Private customs indeed are still to be sought from private tradition. But whoever conceived a notion, that any part of the public law could be buried in the obscure practice of particular person?

To search, seize, and carry away all the papers of the subject upon the first warrant: that such a right should have existed from the time whereof the memory of man runnest not to the contrary, and never yet have found a place in any book of law; is incredible. But if so strange a thing could be supposed, I do not see, how we could declare the law upon such evidence.

But still it is insisted, that there has been a general submission, and no action brought to try the right.

I answer, there has been a submission of guilt and proverty to power and terror of punish-ment. But it would be strange doctrine to assert that all the people of this land are bound to acknowledge that to be universal law, which a few criminal booksellers have been afraid to dispute.

*Wilkes v. Lord Halifax*, ANNUAL REGISTER FOR 1769, at 150-151 (C.P. Nov. 10, 1769)

Came on in the court of common pleas, before lord chief justice Wilmot, the long-expected trial between lord Halifax and John Wilkes, esq; relative to the seizure of his papers, and the imprisonment  of his person. Serjeant Glynn, counsel for the plaintiff, opened the cause, and, in a very elegant and spirited manner, explained the unconstitution-al nature of the injury. He was answered by serjeant Whitaker, who endeavoured to prove, that what the defendant did was not of that unconstitutional nature as had been represented, but that it was merely official, and authorized by an invariable succession of precedents from the earliest times.

Mr. Blackmore, one of the king's messengers, was the first person examined, and honestly confessed, that upon Mr. Wilkes's refusing to him the keys of his bureau, he, agreeable to his orders, "pickt the lock, and swept away every paper he found."

Earl Temple was about half an hour under examination, relative to his being refused admittance to Mr. Wilkes when in the Tower.

Matthew Brown, who was servant to Mr. Wilkes at the time his house was riffled, and was to have been examined on the trial in behalf of his master, was by some unaccountable means kept out of the way.

The counsel for the plaintiff were serj. Glynn, serj. Leigh, and Mr. Leigh. For the defendant, serj. Whitaker, serj. Davy, serj. Nares, and Mr. Wallis.

The jury, after a most excellent charge given by the lord chief justice, to give "liberal but not excessive damages," found a verdict for the plaintiff with 4000 l. damages. The damages were laid for 20,000 l. so that the verdict was much less than the friends of the plaintiff expected, and so little to the satisfaction of the populace, that the jurymen were obliged to withdraw privately, for fear of being insulted. It is reported that they were much divided; some being for more, some for less; but it seems to have operated in some measure, that by the minute book of the treasury, his majesty's pleasure had been signified, that all expences incurred in consequence of actions or prosecutions relative to this affair should be defrayed by the crown: and that, as a farther security to the earl of H--x [*sic*], his lordship had, previous to his resignation in 1765, obtained a privy seal, that is, a warrant signed by the lord privy seal, ==by way of indemnification for whatever damages Mr. Wilkes should recover==, which warrant was signed by his grace of Marlborough, who then held the office.

Several gentlemen gave two guineas to obtain admittance into the court early, at about ten the price fell to a guinea, and at three in the afternoon people got in for five-and-three pence.

Copy from the treasury minute-book, produced on the trial.

"Whitehall, Treasury-Chamber, 31st May, 1765. Present, Mr. Grenville, lord North, Mr. Hunter, and Mr. Harris.

==Mr. chancellor of the exchequer signifies to my lords his majesty's pleasure, that all ex-pences incurred, or to be incurred, in consequence of actions brought against the earl of Halifax, one of his majesty's principal secretaries of state, the under-secretaries and mes-sengers, [\*151] and the solicitor of this office, for proceedings had by them in executing the==

business of their respective offices against the publisher of several scandalous and seditious libels, should be defrayed by the crown; and that a sufficient sum of money should be, from time to time, issued to the solicitor of the treasury, for that purpose.

Read a paper from Mr. Webb, stating what the expences are likely to be, and that a farther sum of 3000 l. may probably be wanted for discharging the same.

Issue to Mr. Webb, from time to time, as the said service may require, a sum not exceeding 3000 l. directing him to apply to the same, according to his majesty's commands, to discharge the several expences abovementioned."

*Samuel v. Payne*, 1 Douglas[3] 345, 99 Eng. Rep. 230 (K.B. April 21, 1780):

Action of trespass and false imprisonment against *Payne*, a constable, and two others. The facts of the case were these: ==*Hall*, one of the defendants, charged the plaintiff== with having stolen some laces from him, which he said were in the plaintiff's house. A search warrant was granted by a justice of peace upon this charge, but there was no warrant to apprehend him. On the search, the goods were not found; however *Payne*, *Hall*, and the other defendant, an assistant of *Payne*'s, arrested the plaintiff, and carried him to the *Poultry Compter* on a *Saturday*, when no Alderman was sitting, by which means he was detained till *Monday*, when, after examination, he was discharged. The cause was tried before Lord Mansfield, and a verdict found against all the three defendants. At the trial, his Lordship, and the counsel on both sides, looked upon the rule of law to be, that if a felony has actually been committed, any man, upon reasonable probable grounds of suspicion, may justify apprehending the suspected person to carry him before a magistrate; but that if no felony has been committed, the apprehension of a person suspected cannot be justified by any body. His Lordship therefore left it to the jury to consider, whether any felony had been committed. The rule, however, was considered as inconvenient and narrow, because, if a man charges another with felony, and requires an officer to take him into custody, and carry him before a magistrate, it would be most mischievous that the officer should be bound first to try, and at his peril exercise his judgment on the truth of the charge. ==He that makes the charge should alone be answerable.== The officer does his duty in carrying the accused before a magistrate, who is authorized to examine, and commit or discharge.

On this ground a motion was made for a new trial, and, after cause shewn, the court held, that the charge was a sufficient justification [*346] to the constable and his assistants, and cited *Ward*'s case in *Clayton* (*a*), 2 *Hale's Pleas of the Crown*, 84, 89, 91, and 2 *Hawkins*, *B*. 2. *cap*. 12. and *cap*. 13. [7].

The *Solicitor General* for the plaintiff—*Dunning* for the defendants.

The rule made absolute [8].

[The reporter's notes:]

[7] None of these authorities comes exactly up to the present case, which is therefore the first determination of the point. In *Ward*'s case (which is very loosely reported) it would seem that the goods had been actually stolen. The very point of this case had been agitated on a demurrer to a special justification so long ago as the reign of *Hen*. 4 (*Year-book* 7 *Hen*. 4. *p*. 35. *pl*. 3.) and the court seems to have thought that if the cause of suspicion should appear reasonable the justification would be good though no felony were committed. But the case was adjourned.

[8] The new trial came on before Lord *Mansfield*, at the sittings after this term, when a verdict was found against *Hall*, and for the other two defendants.

(a) *Clayt*. 44. *pl*. 76.

---

3   This is taken from the first edition of 1783. In the last London edition of 1812, the case appears at pages 359-60.

Francis Hilliard, The Law of Torts or Private Wrongs (2d ed. Boston 1861)

Francis Hilliard, The Law of Torts or Private Wrongs (3d ed. Boston 1866)

Francis Hilliard, The Law of Torts or Private Wrongs (4th ed. Boston 1874)

Floyd R. Mechem, A Treatise on the Law of Public Offices and Officers § 662, at 444-45 (1890)

§ 662. **Unconstitutional Law affords no Protection.**—But here, as has been elsewhere noted, it must be borne in mind that an unconstitutional law is, in legal effect, no law at all, and the **[*445]** ministerial officer can not, therefore, justify his action under it, even though he acted in good faith upon the presumed validity of the law which had not yet been declared to be unconstitutional.[1]

1   Fisher v. McGirr, 1 Gray (Mass.) 1, 61 Am. Dec. 381 [1854]; Ely v. Thompson, 3 A.K. Marsh. (Ky.) 70 [1820]; Osborn v. Bank, 9 Wheat (U.S.) 738 [1824]; Norton v. Shelby County, 118 U.S. [425,] 442 [1886]; United States v. Lee, 106 U.S. 196 [1882]; Cunningham v. Macon R.R. Co. 109 U.S. 446 [1883]; Poindexter v. Greenhow (Virginia Coupon Cases) 114 U.S. 270 [1884]; Sumner v. Beeler, 50 Ind. 341, 19 Am. Rep. 718 [1875]; Lynn v. Polk, 8 Lea (Tenn.) 121 [1881]; Board v. McComb, 92 U.S. 531 [1875]; Astrom v. Hammond, 3 McLean (U.S.C.C.) 107 [2 F. Cas. 71 (1842)].

WILLIAM B. HALE, HANDBOOK ON THE LAW OF TORTS 83 (1896):

Whenever a person sued sets up as a defense that he was an officer of the government acting under color of law, he must show that the law authorized the act to be done, and that he acted in good faith.[83] Where his authority fails, his protection is gone. ... Even where the authority of the officer fails because the law under which he acted, even in good faith, has been declared unconstitutional,[86] he is liable.

---

83  *Tweed's Case*, 16 Wall. 504. [83 U.S. 504 (1873)]

86  Mech. Pub. Off. p. 445, § 662, collecting cases. [*I.e.*, FLOYD R. MECHEM, A TREATISE ON THE LAW OF PUBLIC OFFICES AND OFFICERS (1890), *reviewed in* 5 POLITICAL SCIENCE QUARTERLY 353-355 (June 1890) ("The probable reason why no book has ever been written in the English language upon the law of officers is that officers have never occupied so important a place in either England or the United States as upon the continent. The English idea of an officer has always been that he was simply a private citizen, who for the time being was aiding in the ..."); *relied on in* Bogan v. Scott-Harris, 523 U.S. 44 (1998) (absolute immunity for legislative acts of municipal officials).] [1,501-502[2],510-513[4],528-532[5],537-547[11],554-571[18],718-725[8]

Comment, *Constitutional Law—Criminal Liability—Acts Done Under an Unconstitutional Statute*, 12 Harv. L. Rev. 352 (1898)

Constitutional Law—Criminal Liability—Acts Done Under an Unconstitutional Statute.—A statute repealed a law which imposed upon the defendants, who were public officers, a certain duty, the neglect of which was criminal. *Held*, that the defendants are not indictable for the neglect of such duty, if they relied upon the repealing statute, *bonâ fide* believing it to be constitutional, althoug it was afterwards declared unconstitutional by the courts. *State v. Godwin*, 31 S.E. Rep. 221 (N.C. [1898]).

The case seems to be correct on principle, although there is a direct conflict of authority on the question. Many jurisdictions hold that when a legislative enactment proves to be invalid, it is, for all legal purposes, as if it had never existed; and, before it has been declared unconstitutional by the courts, acts done or duties neglected by a public officer, *bonâ fide* believing it to be valid and in reliance upon it, are, according to the general rule, not excused by his ignorance of the law. *Sumner v. Beeler*, 50 Ind. 341 [1875][4]; *Campbell v. Sherman*, 35 Wis. 103 [1874]. The better and more just doctrine, however, appears to be that the officer is protected unless the statute relied upon appears on its face clearly unconstitutional. *Henke v. McCord*, 55 Iowa, 378 [1880]; *Sessums v. Botts*, 34 Tex. 335 [1871].

---

4    *Id.* at 342: "No question in law is better settled, and this is admitted by the counsel for the appellants in their brief, than that ministerial officers and other persons are liable for acts done under an act of the legislature which is unconstitutional and void. All persons are presumed to know the law, and if they act under an unconstitutional enactment of the legislature, they do so at their peril, and must take the consequences."

Note, *Unconstitutional Legislation as a Defence*, 13 Harv. L. Rev. 407-08 (1900)

Unconstitutional Legislation as a Defence.—The liability of an officer who executes a law which is later held void is one of the unsatisfactory phases of the American doctrine of unconstitutional legislation. It is a development of an older problem: the defence of treaspass afforded by judicial process. An officer is not protected in the execution of warrants which disclose on their face their invalidity. This is not, however, limited to defects of form. An excess of jurisdiction, not dependent on some error in the previous procedure, is said to appear from the face of the document since an officer of court is presumed to know the law. The reasoning, first applied to the common law law limits of jurisdiction, has been extended, in most States, to an exercise of jurisdiction [*408] given by unauthorized local ordinances and statutes later held unconstitutional. And so, although it is admitted that a judge of a superior court is not liable for any judicial utterance, subordinate justices, sheriffs and even public prosecutors have been held liable for enforcing mandates of legislative bodies. *Kelley v. Bemis*, 4 Gray, 83 [70 Mass. 83 (1855)]; *Merrit v. St. Paul*, 11 Minn. 223 [1866]; *Warren v. Kelley*, 80 Me. 512 [1888]. A few States, however, have repudiated this doctrine. *Edes v. Boardman*, 58 N.H. 580 [1879]; *Brooks v. Mangan*, 86 Mich. 576 [1891]. The reasoning of this latter case was recently affirmed and applied in defence of a public officer who procured issue of process under an ordinance which the court held invalid. *Tilman v. Beard*, 80 N.W. Rep. 248 (Mich. [1899]).

In continental Europe the need of decisive executive action in States surrounded by enemies gave rise to a distinct system of administrative law for the protection of such officials. England, however, since freer from external pressure, developed no such system. In this country, though it is thought that the foundations are being laid for a national administrative law, as yet it has not been generally recognized. The problem of unconstitutional legislation, however, is peculiarly our own, and it may be suggested that old precedents derived from England should not prevent our working out in this case some system of administrative protection.

It would seem, moreover, that a distinction may be drawn between those early decisions and the principal case. The reason for the original doctrine that an executive officer is liable for excess of jurisdiction was the danger of abuse of official power. From unconstitutional laws, however, our danger is not abuse of process, but abuse of legislative discretion. It is, moreover, not unfair to hold that officers are bound to know the extent of their jurisdiction at common law; but to say they must know the true limits of the authority of a legislature is to demand an impossibility. The maxim that "ignorance of law excuseth no one" is here inapplicable. The officer does not rely on the statute as law, but on the statute as fact,—as an order or declaration of a body which he is bound to obey. To reply with the fiction that such statute is as if it never had been made is a confession of weakness. Overruling an act of legislature is a decision to be made with reluctance even by a co-ordinate department. It would be, therefore, highly unbecoming in a subordinate official to deny validity to a statute. To compel him to such a decision is to abandon a cardinal principle of constitution interpretation. In view of these objections, one would think that the liability attached to officers who exceed their common law jurisdiction should not be extended in this country to express statutory additions to their jurisdiction in which the legislature has exceeded its powers.

H. Gerald Chapin, Handbook of the Law of Torts 138-39 (1917):

   If the conduct of a public officer amounts to an act of state, then ... no personal responsibility can arise therefrom, nor can the state itself, being superior to the law, be held liable in any event, except by its own consent.[37] But for other acts, and subject to what shall hereafter be said, the rule can be laid down that no immunity will attach merely by virtue of official position, nor can the inviolability of the state itself be invoked for the protection of the actor. ... Nor will it be a [**139**] defense that he acted under a statute, if the latter is found to be unconstitutional, since, being void, no power or jurisdiction could be derived from it. Inability to forecast the ultimate decision as to its constitutionality will not avail him.[40] If the statute is valid, the officer is of course protected where he acted within the lines of his duty and in a proper manner. But where his conduct is prima facie unlawful the burden rests upon him of proving the existence of facts which justify his action.

---

37  [omitted]

40  Sumner v. Beeler, 50 Ind. 341, 19 Am. Rep. 718 [1875]; Kelly v. Bemis, 4 Gray (70 Mass.) 83, 64 Am. Dec. 50. It is quite conceivable that "it may devolve upon the officer a vast responsibility in some cases." Campbell v. Sherman, 35 Wis. 103, 110. It requires him to decide at his peril; for, if he refuses to act because he believes a valid statute to be unconstitutional, he will likewise be liable to the party aggrieved. Clark v. Miller, 54 N.Y. 528. But the doctrine announced in the text does not appear to have met with universal favor. Henke v. McCord, 55 Iowa, 378, 7 N.W. 623; Shafford v. Brown, 49 Wash. 307, 95 Pac. 270.

Restatement Torts, § 119, at 249 (1934).

§ 119. Arrest without Warrant by Private Person for Criminal Offense.

Subject to the rules state in §§ 127 to 136, a private person is privileged to arrest another without a warrant for a criminal offense,

(a) if the other has committed the felony for which he is arrested, or

(b) if an act or omission constituting a felony has been committed and the actor reasonably suspects that the other has committed such act or omission, or

(c) if the other, in the presence of the actor, is committing a breach of the peace or, having so committed a breach of the peace, he is reasonably believed by the actor to be about to renew it, or

(d) if the other has attempted to commit a felony in the actor's presence and the arrest is made at once or upon fresh pursuit, or

(e) if the other knowingly causes the actor to believe that facts exist which would create in him a privilege to arrest under the statement in Clauses (a) to (d).

*Caveat to Clause* (b): The Institute expresses no opinion as to whether or not a private individual is privileged to arrest another upon the reasonable suspicion that the other has attempted to commit a felony, the attempt having been made by a third person.

*Comment:*

...

**[*250]**

*b.* The privilege to arrest without a warrant is not defeated merely by the fact that there is opportunity to secure a warrant, although the failure to obtain a warrant may be significant in determining the reasonableness of the conduct of one arresting another upon suspicion.

...

*f. If felony not punishable.* The privilege to arrest another, who is guilty of the felony for which the **[*251]** arrest is made or who is reasonably suspected of having committed the felony for which he is arrested, exists only if he has committed or is suspected of having committed an act constituting a felony which is punishable at the time of the arrest. Thus, there is no privilege to arrest one who has previously committed a felony as to which he has been acquitted, convicted, or pardoned. Similarly, there is no privilege to arrest a person on suspicion of his having committed a felony as to which, to the knowledge of the actor, he has been convicted, acquitted, or pardoned, or against which the Statute of Limitations has run.

...

*Comment on Clause* (b):

*h.* If no felony has been committed, one not a peace officer is not privileged to make an arrest under Clause (b), although he reasonably suspects that a felony has been committed and that the other has committed it. An additional privilege is given to a police officer under the rule stated in § 121.

**[\*252]**

*Illustration:*

  1. A bill has been posted offering a reward for the apprehension of a person who is stated to have murdered A and of whom the bill gives a detailed description. B reasonably believes that C, whose appearance closely corresponds to the description given in the bill, is the alleged murderer. Irrespective of whether B is a private person or a peace officer, he is privileged to arrest C, if A has in fact been murdered, although C is not the person who murdered A. Unless B is a peace officer, he is not privileged to arrest C if it is subsequently discovered that A was not murdered but had committed suicide.

  *i. Necessity of actual felony.* In order that a private individual may be privileged to arrest another on suspicion of felony, it is necessary that an act or omission actually constituting a felony has been committed and that the actor reasonably suspects that the other whom he arrests has committed a felony. It is not enough that the actor, if a private person, believes no matter how reasonably that felonious act has been committed and that the other committed it. Not only must the act, of which the actor suspects the other, have been committed but the act must be a felony. The fact that an act has been committed and that the actor through a mistake of law or fact reasonably believes such act to be a felony does not give him any privilege to arrest another whom he knows or reasonably suspects of having committed the act, and this is so although the act, while not a felony, is a breach of the peace or misdemeanor. Thus, where the other has stolen a watch worth a dollar and so committed **[\*253]** a misdemeanor, the actor knowing of such theft is not privileged to arrest the other for it, although he believes the watch is of the value of fifty dollars, in which case a felony would have been committed, or mistakenly believes that the theft of even a dollar watch is a felony. A fortiori a mistake of law as to his privilege to arrest for a misdeamenor does not affect his privilege.

  ...

**[\*254]**

  *k.* What constitutes a reasonable suspicion upon a given set of facts is a question for the court and not the jury.

  ...

*Comment on Clauses* (c) *and* (d):

  ...

**[\*255]**

  *n.* The privilege stated in Clause (c) was confined in the early English cases to the detention of the person who was breaking the peace in the actor's presence, or reasonably suspected of intending to renew a breach of the peace so committed until the offender could be given into the custody of a peace officer so that the peace officer might take him before a magistrate to be bound over to keep the peace. It may be, however, that the offense is committed in the actor's presence and the offender is at an appreciably later time turned over to the peace officer. If, during the interval, the actor is in effective control over the person of the offender, as where the offense is committed in a moving train from which the offender cannot escape until his station is reach, this is sufficient detention to justify the

railway authorities in turning over the peace breakers to police officers on arriving at the nearest stopping point.

   *o. Reasonable suspicion.* To create the privilege to arrest another, it is not enough that the actor—whether a private person or a peace officer—reasonably suspects that the other is committing a breach of the peace, except as stated in Clause (e), and in § 121 (c) where the actor is a peace officer and he arrests a participant in an affray. If in fact no breach of the peace has been committed, a mistaken belief on the part of the actor, whether induced by a mistake of law or of fact and however reasonable, that a breach of **[*256]** the peace has been committed by the other, does not confer a privilege to arrest under Clause (c).

*Illustration:*

   4. A, a private person, sees B and C fighting. Reasonably believing it to be a mutual combat, A arrests both B and C. In fact B was acting in self-defense. A's arrest of B is not privileged, although if A were a peace officer, the arrest would be privileged under the rule stated in § 121 (c).

   ...

**[*257]**

*Comment on Clause* (e):

   *r.* To create the privilege under the statement in this Clause, the other must either intend his conduct, whether of ac or omission, to induce the actor to believe in the existence of facts which create the privilege to arrest him, or as a reasonable man should realize that his conduct creates a substantial probability of inducing the other so to believe.

Restatement Torts, § 121, at 259 (1934).

§ 121. Arrest by Peace Officer without Warrant.

Subject to the rules stated in §§ 127 to 132, a peace officer acting within the limits of his appointment is privileged to arrest another without a warrant

(a) under any of the conditions which, under the rules stated in §§ 119 and 120 give to a private person the privilege to arrest without a warrant, or

[*260]

(b) although no act or omission constituting a felony has been committed, the officer reasonably suspects that such an act or omission has been committed and that the other has committed it, or

(c) an affray is being or has been committed in the officer's presence and he reasonably suspects that the other is or has been participating therein and the arrest is made at once or on fresh pursuit.

Comment:

...

[*262]

*Comment on Clauses* (b) *and* (c):

*g.* These Clauses state the privilege of a peace officer in making an arrest which is additional to that [*263] of a private person. The additional privilege is given because the peace officer has a duty to the public to prevent crime and arrest criminals; the performance of these duties would be seriously impaired unless peace officers were given considerable discretion in their performance and protected from liability for the consequences of honest and reasonable mistakes.

...

*i. Officer's mistake of law and fact.* A peace officer making an arrest without a warrant is protected in every case where he acts under a reasonable mistake as to the existence of facts which, under the rule state in this Section justify an arrest without a warrant. On the other hand, no protection is given to a [*264] peace officer who, however reasonably, acts under a mistake of law other than a mistake as to the validity of a statute or ordinance. Thus, an officer is not privileged to arrest another whom he reasonably suspects of having committed an act which the officer, through a mistake of law reasonable to one of his position, believes to be a common law felony. So too, a peace officer is not privileged to arrest another whom he reasonably suspects of having committed an act which the officer, through a mistaken construction of a statute, believes to have been made a felony by such statute. And this is so although the reasonable character of the officer's mistake is proved by the fact that at the time of the arrest the statute is generally understood to make such an act a felony and is not judicially construed to the contrary until after the arrest is made.

*Caveat:* The Institute expresses no opinion as to whether or not the fact that a statute or municipal ordinance is declared to be unconstitutional ==or otherwise invalid== subsequent to the arrest precludes the existence of a privilege in a peace officer to arrest another without

a warrant whom the officer would have been privileged to arrest if the statute or ordinance had been valid.

*Comment to Caveat:*

  This Caveat includes not only cases in which an officer arrests another on suspicion that the other has committed an act which the invalid statute declares to be a felony but also those cases in which an officer, who is privileged by statute to arrest without a warrant for a misdemeanor, makes an arrest for an act declared to be a misdemeanor by an invalid statute. So too, the Caveat includes cases in which a peace officer who has authority by statute to arrest without a warrant for a breach of an ordinance makes an arrest for the violation of an ordinance which is subsequently delcared to be unconstitutional or otherwise invalid.

**[\*265]**

*Comment:*

  *j.* As is stated in Comment on § 119 (c), the privilege of a person not a peace officer to arrest for a breach of the peace is limited to those situations where an actual breach of the peace is being or has been committed by the other. The peace officer, on the other hand, is privileged to arrest all the actual or apparent participants in an affray, although some of these are innocent. There are peculiar reasons for extending the peace officer's privilege in this situation, as an affray, which includes a criminal assault or battery, is a particularly dangerous type of breach of the peace, and there is an immediate necessity for the officer to intervene. The necessity is not so clear in cases where a breach of the peace not involving an affray is or has been committed.

Restatement, Torts, § 128, at 292 (1934).

§ 128. Actor's Manifestation of His Intention.

(1) Except as stated in Subsection (2), the arrest of another is not privileged unless the actor manifests to the other his intention to arrest him and

(a) if the arrest is without a warrant, the offense or other conduct for which the arrest is made; unless the other, knowing the actor to be a peace officer, does not request such information;

[*293]

(b) if the arrest is under a warrant, his possession of the warrant and the offense or conduct charged therein.

(2) None of the manifestations stated in Subsection (1) is required, if the making thereof is reasonably believed by the actor to be:

(a) dangerous to the actor a third person, or

(b) likely to imperil the making of the arrest, or

(c) useless or unnecessary.

*Comment on Subsection* (1):

*a.* It is not necessary that the actor use any particular form of words in making the manifestations required by the statement in this Subsection. Any words or conduct are sufficient if they fairly apprise the other of the actor's intention to arrest him, and indicate the offense or other conduct for which the arrest is sought to be made without a warrant, or if the actor's possession of the warrant and its contents if the arrest is sought to be made under a warrant. The fact that a peace officer making an arrest is to the other's knowledge in uniform or so displays his badge of office as to be reasonably visible to the other, is a sufficient manifestation of his intention to make the arrest.

*b. Indication of grounds of arrest.* Except as stated in Comment *f*, an arrest either with or without a warrant, is not privileged if the actor indicates to the other that he is making the arrest for an offense or conduct other than that for which he is making it. Thus, if a peace officer, who reasonably suspects another of having committed murder, when arresting the other for murder, manifests to him that the arrest is made for perjury or for a misde-
[*294]meanor, the arrest is not privileged although the actor reasonably suspects the other of purjury or the other is actually committing a misdemeanor in the actor's presence, so that the actor would be privileged to arrest him therefor. So too, if the arrest is made under a warrant, the arrest is not privileged if the actor informs the other that the arrest is being made for a crime other than that charged in the warrant.

*c.* A manifestation of an improper cause for arrest in addtion to the cause for which the arrest is made does not defeat the actor's privilege and this is so although the additional cause is one which alone would not give the actor the privilege to arrest the other.

*Illustrations:*

1. A, a peace officer, reasonably suspecting B of having committed burglary and perjury, arrests him, telling him that the arrest is for both. A is privileged, although he neither intends nor does charge B with any offense other than perjury.

2. A peace officer, reasonably suspecting that B has committed arson but having no ground to believe that he has committed burglary, arrests him, tellinghim that he arrests him for both. A is privileged.

*d.* Except as stated in Subsection (2), the actor arresting another without warrant must, unless he is a peace officer, inform the other of the offense or conduct for which the arrest is made. If a peace officer makes an arrest without a warrant, the fact that he is in uniform, or so displays his **[*295]** badge of office as to be reasonably visible to the other, is a sufficient manifestation that he is making an arrest upon suspicion of felony or for breach of the peace or other conduct for which by common law or by statute he is authorized to arrest the other. Therefore, the officer need not before making the arrest or while he is making it apprise the other of the conduct for which the arrest is being made. If, however, the other, upon the officer manifesting his purpose to arrest, asks the officer for what conduct the arrest is being made, the officer must apprise him thereof and if he does not do so, the other is privileged to resist the arrest as unprivileged. So too, if, after an arrest made without apprising the other of the cause thereof, the other asks information and the officer refuses to give it, the other is privileged to use such force as is reasonably necessary to free himself from the custody which the officer has taken of him. In many States there are statutory provisions to the effect that an officer making an arrest without warrant must "when arresting a person," "in arresting a person," or "at the time of arrest," inform the person of his authority and the cause of the arrest, with certain exceptions generally relating to arrest of persons in the actual commission of an offense or upon fresh pursuit.

...

*Comment on Subsection* (2):

*f. When manifestation of grounds of arrest or possession of warrant unnecessary.* If the actor reasonably believes that the other is incapable of understanding any manifestation, as where the other is intoxicated or insane, or is unfamiliar with the language, it would be absurd to require the actor to make an apparently useless demonstration. If the person arrested knows of the cause of his arrest, the manifestation thereof would be a mere superfluous and idle ceremony and is therefore not required. If an officer attempts to arrest or arrests another engaged in the commission of an offense or on fresh pursuit, the officer is ont required to manifest the cause of arrest. In such case it is extremely unlikely that the person arrested is unaware of the fact that he is committing the offense but his ignorance thereof is immaterial, unless the actor realizes or should realize that the other is not aware that his conduct constitutes an offense. Where the offense for which the arrest is made is a breach of the peace, such a situation rarely arises, but it may readily arise where the arrest is made under statutory authority for a misdemeanor or a breach of an ordinance.

If the actor reasonably believes that the other, if warned of the actor's intention to arrest him, **[*297]** will offer resistance which may defeat the arrest or will make a possibly successful attempt to flee, the actor is privileged to arrest the other without any of the manifestations which are usually required. So also, such manifestations are not required if the other's character is known or reasonably believed to be such as to make it likely that he

will offer resistance threatening injury to the actor or a third person. Since no manifestation need be made where it is likely to defeat the arrest or to make it dangerous to the actor, and since it is the actor's duty to effect the arrest with the least possible force, the actor is privileged to manifest a false cause for arrest if by so doing he reasonably believes that he can prevent a flight or resistance which is likely to be successful or dangerous. Thus, if the actor is privileged to arrest another of desperate character for a serious crime and he reasonably believes that the other or his friends will offer effective or dangerous resistance to the arrest for such a crime, he is privileged to state that he is arresting the other for some lesser offense, if by so doing there is reasonable chance of preventing such resistance.

*Illustration:*

3. A, a policeman, reasonably suspects B, a man of desperate character, of having murdered C. A sees B driving an automobile, containing several other persons of similar character. Irrespective of whether B is or is not driving in violation of a traffic act or ordinance, A is privileged to arrest B, stating that the arrest is for the violation of such act or ordinance, although upon taking B to the station, A causes B to be booked for murder.

**[*298]**

*g.* If the actor is excused, under the statement in this Subsection, from making, at the time of arrest, any of the manifestations required by Subsection (1), he must make them at the first practicable moment thereafter.

Restatement (Second) Torts, Appendix § 119, at 122.

Reporter's Notes

Illustration 1 is supported by Burns v. Erben, 40 N.Y. 463 (1869); Reuck v. McGregor, 32 N.J.L. 70 (1866); Davis v. United States, 16 App. D.C. 442 (1900); American Ry. Express Co. v. Summers, 208 Ala. 531, 94 So. 737 (1922).

Restatement (Second) Torts, Appendix § 128, at 136-38.

Reporter's Notes

...

**[\*137]**

*Comment d:* If the officer is arresting without a warrant, he need not disclose the cause of arrest when not requested to do so. Ward v. Green, 11 Conn. 455 (1836); State v. Krakus, 5 Boyce (Del.) 326, 93 A. 554 (1915); see Wolf v. State, 19 Ohio St. 248 (1869); Shovlin v. Commonwealth, 106 Pa. 369 (1884); State v. Taylor, 70 Vt. 1, 39 A. 447, 42 L.R.A. 673, 67 Am. St. Rep. 648 (1896); State v. Anderson, 19 S.C.L. (1 Hill) 327 (1833).

But if his authority is questioned, he must disclose to the other the fact that he is acting in his official capacity, and the cause for which the arrest is made. Ward v. Green, 11 Conn. 455 (1836); Wolf v. State, 19 Ohio St. 248 (1869); State v. Anderson, 19 S.C.L. (1 Hill) 327 (1833); State v. Byrd, 72 S.C. 104, 51 S.E. 542 (1905); Hodge v. Piedmont & N. R. Co., 109 S.C. 62, 95 S.E. 138 (1918).

...

Throughout, the Restatement has taken the position which gives the greater information to the person to be arrested. This is in accord with most of the statutes, which contain provisions similar to those state in this Section. See, for example, New York Criminal Code, § 173.

*Comment f:* Manifestation is not required where the person arrested knows of the warrant, or if arrested without a warrant knows why he is arrested. State v. Garrett, 60 N.C. 144, 84 Am. Dec. 359 (1863); Martin v. Sanford, 129 Neb. 212, 261 N.W. 136, 100 A.L.R. 179 (1935); State v. Dula, 100 N.C. 423, 6 S.E. 89 (1888); Letcher v. Crandell, 18 Tex. Civ. App. 62, 44 S.W. 197 (1898); Dale v. Commonwealth, 186 Ky. 510, 217 S.W. 363 (1920); Hickey v. Commonwealth, 185 Ky. 570, 215 S.W. 431 (1919); Wolf v. State, 19 Ohio St. 248 (1869); King v. State, 89 Ala. 43, 8 So. 120 (1889); State v. Byrd, 72 S.C. 104, 51 S.E. 542 (1905).

Manifestation is not required **[\*138]** where time does not permit it without danger of frustrating the arrest. King v. State, 89 Ala. 43, 8 So. 120 (1889); Tuck v. Beliles, 153 Ky. 848, 156 S.W. 883 (1913); Rex v. Payne, 1 Moody C.C. 378, 168 Eng. Rep. 1310 (1833); State v. McAfee, 107 N.C. 812, 12 S.E. 435, 10 L.R.A. 607 (1890), overruled, State v. Mobley, 240 N.C. 476, 83 S.E.2d 100 (1954); Lewis v. State, 3 Head (Tenn.) 127 (1859); Ringhand v. Grannan, 12 Ohio C.C. N.S. 255, 31 Ohio C.C. 587 (1909), petition in error dismissed for want of preparation, 7 Ohio L.R. 530, 54 Wkly. Law Bul. 518.